**In re ANTINARELLI ENTERPRISES, INC. d/b/a Sound Advice, Debtor.**

**ITT COMMERCIAL FINANCE CORPORATION, Plaintiff–Appellant,**

v.

**John F. CULLEN, Trustee in Bankruptcy of Antinarelli Enterprises, Inc., Defendant–Appellee.**

Civ. A. No. 88–1660–K.

United States District Court, D. Massachusetts.

Jan. 13, 1989.

Gordon N. Schultz, Mark A. Stull, Schultz & Bednarz P.A., Boston, Mass., for plaintiff-appellant.

John F. Cullen, Cullen & Resnick, Boston, Mass., for defendant-appellee.

KEETON, District Judge.

This matter is before the court on appeal from the decision of the Bankruptcy court in *ITT Commercial Finance Corp. v. John F. Cullen, Trustee in Bankruptcy of Antinarelli Enterprises, Inc.,* 94 B.R. 227 (Bankr.D.Mass.1988), in which, on cross-motions for summary judgment, the bankruptcy court granted summary judgment for the defendant.

## I.

The essential facts upon which the appeal is based are as follows:

On October 22, 1984, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed against Antinarelli Enterprises, Inc. ("Antinarelli").

Earlier, on July 26, 1983 E.I. DuPont Denemours & Co., Inc. ("DuPont") brought suit in a state court against Antinarelli for monies owed. Judgment was rendered for DuPont in the amount of $49,442.40 in damages and $60.30 in costs. Approximately one year later, having recovered only a portion of its judgment against Antinarelli, DuPont petitioned the Middlesex Superior Court to appoint a receiver in order to recover monies owed from the 1983 judgment. On July 27, 1984, the Middlesex Superior Court appointed Barry Klickstein, Esq. as receiver for Antinarelli.

Between July 27, 1984 and October 9, 1984, Attorney Klickstein took possession of two checks in the amount of $15,000.00 each written on Antinarelli's bank account and made out to Barry Klickstein, and American Express credit card drafts for $17,563.67. Entitlement to only one of the two checks (check No. 1005) was argued before the bankruptcy court and consequently only the dispute over check No. 1005 is on appeal before this court.

On June 14, 1984, Antinarelli entered into a Security Agreement with ITT in which Antinarelli agreed to give ITT a blanket security interest in "inventory, raw materials, finished goods, machines, equipment, accounts receivable, bank debts, notes, chattel paper, drafts, contracts, contract rights, choses in action, and general intangibles, and proceeds thereof." The agreement was perfected on July 3, 1984. ITT alleges that Antinarelli now owes it approximately $250,000.00.

On April 8, 1985, the United States Bankruptcy Court for the District of Massachusetts found that John F. Cullen, Trustee in Bankruptcy for Antinarelli ("Trustee") was entitled to avoid the payments by Antinarelli to DuPont as preferential transfers under 11 U.S.C. § 547. *In re Antinarelli Enterprises, Inc.*, Adv. No. 84–385.

ITT, claiming that it had a perfected security interest in the funds recovered by the Trustee, then brought suit against the Trustee to recover the funds the estate received in the preference action. The United States Bankruptcy Court for the District of Massachusetts entered summary judgment for the Trustee concluding that (1) ITT would not have been able to recover directly from DuPont and (2) prepetition security interests do not survive preference procedures, so that even if ITT had a valid security interest as against DuPont, ITT lost that security interest when the Trustee recovered the funds pursuant to 11 U.S.C. § 547. Preference Memorandum, pp. 6, 7. ITT argues on appeal that the conclusions of the bankruptcy court are erroneous as a matter of law. The proceedings below were on cross-motions for summary judgment, and neither party asserts on this appeal that the decision of the bankruptcy judge was in any way premised on any disputable finding of fact. However, on appeal to this court, at least one party claims that there are disputed fact questions to be resolved with regard to any questions of "tracing" that might arise should this court reverse the decision of the bankruptcy court.

## II.

ITT claims on appeal that the bankruptcy court made essentially two errors of law in reaching the conclusion that ITT could not have recovered directly from DuPont in the absence of bankruptcy. First, ITT argues that the bankruptcy court erroneously held that the funds paid to DuPont (the $15,000.00 check and the credit card drafts) by the debtor were "cash proceeds", rather than collateral or non-cash proceeds as defined in Mass.Gen. Laws ch. 106, § 9–306. Second, ITT argues that the bankruptcy court erroneously held that the payment to DuPont was within the "business exception" to § 9–306 codified in Official Comment 2(c).

### A. Definition of the Funds

Official Comment 2(c) to Mass. Gen. Laws ch. 106, § 9–306 allows recipients of

cash proceeds to take free of any claim which the secured party may have in them as proceeds where such cash proceeds "are covered into the debtor's checking account and paid out in the operation of the debtor's business." The definition of the funds paid to DuPont therefore is critical to ITT's claim because only "cash proceeds" are subject to this "business exception."

Section 9–306 defines proceeds as "whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of." It is undisputed that the check (check No. 1005) for $15,000.00, if identifiable as proceeds from the sale of Antinarelli's collateral, is cash proceeds as defined in section 9–306. On the other hand, ITT argues that the American Express Credit Card drafts are *collateral* and not proceeds since the drafts are merely evidence of an obligation to pay and therefore required an affirmative act by DuPont to change the drafts into proceeds. The bankruptcy court concluded, however, that the credit card drafts were received as a result of the sale of the debtor's collateral and therefore are considered proceeds under § 9–306.

ITT further argues that even if the credit card drafts are considered proceeds, they are "non-cash proceeds" and are consequently not subject to the business exception. Cash proceeds are defined as "cash, checks and the like." Non-cash proceeds are defined as "all other proceeds." The bankruptcy court held that the credit card drafts are like checks and therefore are cash proceeds.

I need not decide either of these two disputes about whether the drafts are cash or non-cash proceeds because Official Comment 2(c) is inapplicable for an independent reason—the drafts were never "covered into the debtor's checking account", but rather, were assigned directly to the receiver.

### B. Official Comment 2(c)

■ (i) Official Comment 2(c) is explicitly limited to cases in which cash proceeds are "covered into the debtor's checking account." This is not a mere formality. A secured creditor, in almost every instance, has priority over an unsecured creditor or a junior lien creditor. Official Comment 2(c) creates an exception in those circumstances in which it would be too difficult to trace the proceeds because they were deposited into a debtor's checking account and paid out in ordinary course; in such circumstances the policy of allowing businesses to continue day to day operations is weightier than the general policy of favoring the secured creditor.

In this case, it is undisputed that the credit card drafts were never covered into Antinarelli's account. Therefore this provision is inapplicable. The usual rule, section 9–306, that identifiable proceeds, cash or non-cash, are transferred subject to a perfected security interest, therefore applies to the credit card drafts. Thus, I must conclude that if ITT could have established before the bankruptcy court that the credit card drafts were either collateral or identifiable proceeds, then ITT could have recovered directly from DuPont. The bankruptcy court explicitly declined to rule on the issue of "tracing" because of its ruling that all of the funds paid to DuPont were within the business exception. Because there are other legal issues and possible material and generally disputable factual issues, that may affect the ultimate ruling, final decision cannot be made in this appeal.

(ii) ITT argues that the money paid out from Antinarelli's checking account (check No. 1005) also is outside the reach of the business exception for two reasons: (1) because the transfer occurred after the receiver was appointed, any deposit of funds into the debtor's checking account was really a deposit into the account of the receiver since the debtor was acting as a mere agent of the receiver and (2) because a receiver had been appointed, and DuPont was therefore a lien creditor, the transfer to DuPont could not have been "in ordinary course."

ITT argues that despite the actual transfer of funds into the debtor's account, Official Comment 2(c) is inapplicable because the appointment of a receiver converted the debtor's accounts into accounts belonging to the receiver. ITT argues that pursuant

to Mass.Gen. Laws ch. 156B, §§ 104, 105, control of the debtor's estate and effects, upon appointment of a receiver, is vested in the receiver. Thus, ITT contends it was legally impossible for any funds to be "covered" into the *debtor's* account.

I am not persuaded that as a matter of law, and without regard to whether in fact the receiver took possession of the debtor's assets, the appointment of a receiver converts the debtor's account into accounts belonging to the receiver. Although it is clear that the monies deposited in the accounts were subject to the right of the receiver to seize that money, ITT proffers no authority for its position that the very fact of a receivership divests the debtor of title to the account itself. Although I do not conclude that as a matter of law a receivership changes the account from one belonging to the debtor to one belonging to the receiver for purposes of Official Comment 2(c), I do conclude that the fact that a receiver was appointed is relevant to ITT's argument that the payment to DuPont was not in the ordinary course.

There are no Massachusetts cases defining "ordinary course" or "operation of business." Cases that have discussed Official Comment 2(c) have concluded at least that fraud by the debtor, or collusive fraud by the debtor and the transferee, would be out of the ordinary course. *See Brown & Williamson T. Corp. v. First Nat. Bk. of Blue Island*, 504 F.2d 998 (7th Cir.1974); *Universal C.I.T. Island Credit Corp. v. Farmers Bank of P.*, 358 F.Supp. 317, 324 (E.D.Miss.1973).

ITT argues that the payments to DuPont were not in the ordinary course because (1) a payment to a "lien creditor" cannot be in the ordinary course as a matter of law since it is not a voluntary payment, (2) the payment was transferred to a receiver who was supposed to act for the benefit of all the creditors, and (3) the previous order of the bankruptcy court, affirmed by this court and the First Circuit, allowing the Trustee to avoid the payment to DuPont as a preference, required a holding by the bankruptcy court that, as a matter of law,

the payment to DuPont was *not* in the ordinary course. *See* 11 U.S.C. § 547(c).

The bankruptcy court concluded that "[p]aying suppliers is part and parcel of the operation of a business and payment by check or other cash equivalents such as American Express Drafts is precisely the type of payments the drafters of the U.C.C. presumably wanted to be free from the reach of secured creditors." Preference Memorandum, p. 5. In its written memorandum the bankruptcy court held immaterial ITT's argument that the business exception applies only when payments are made voluntarily. However, the bankruptcy court did note that there was evidence to suggest that the payments were voluntary (despite the fact that the receiver had been appointed and that the payments were made after the receiver threatened confiscation of Antinarelli's assets). Of course, if there is a genuine dispute of material fact, it cannot be resolved by a ruling on cross-motions for summary judgment.

ITT argues that the payment from Antinarelli to DuPont via the receiver was not in the ordinary course, because once the receiver was appointed the "debtor had no right of control; therefore he lacked capacity to make a voluntary payment." Appellant's Brief, p. 21 (Docket No. 5). Furthermore, ITT argues that the fact that the receiver did not actually take possession of the assets, but instead accepted "voluntary" payments does not transform the payment to one made in the ordinary course. ITT cites only one case that discusses the relationship between voluntariness and ordinary course. *See Barber–Greene Company v. National Bank of Minneapolis*, 816 F.2d 1267 (8th Cir.1987).

In *Barber Greene*, the court held that Official Comment 2(c) was inapplicable to the case because the debtor's account out of which payments were allegedly made to the bank (creditor) was really an account over which the bank itself had exclusive control. The court held that "Official Comment 2(c) presupposes an account over which the debtor exercises control, into which the debtor voluntarily makes payments to third parties who take in good

faith." *Id.*, at 1272. When these requirements were not met, however, the court held that "the principles set forth in Comment 2(c) were not intended to protect the bank." *Id.* ITT argues that *Barber Greene* is in point because in this case, the debtor also lacked control over its bank account because the receiver had the power in fact to take possession of the collateral. ITT argues that regardless of whether the receiver actually exercised that power, as a matter of law it is erroneous to conclude that the payments could be made in the ordinary course.

Although neither party has called attention to precedent directly in point, and I am aware of none, I conclude that ITT's position is correct. Common sense suggests that a payment to a supplier/creditor in the circumstances of this case—after that supplier has gone to court, obtained a judgment, succeeded in getting a receiver appointed, and obtained payment only after the receiver made it clear to the debtor that the receiver had the power to seize the debtor's assets—is not in ordinary course. In addition it seems somewhat antithetical to the general policy underlying the priority system set up in the Uniform Commercial Code that a supplier, who has become a lien creditor, can take ahead of a prior perfected secured creditor. (Especially is this so, in view of the fact that the exception is codified in an official comment and not a code section.)

The bankruptcy court treated the payment, regardless of its form, as one to a "supplier", rather than to a "creditor." Although presenting cogent arguments against this position, ITT has not been able to produce precedents directly in point. The only cases of which I am aware that hold a payment not in the ordinary course involved fraudulent conveyances and the like, and there is no showing here that the receiver or DuPont was aware of ITT's security interest. ITT does point out, however, that DuPont and the receiver had constructive notice of the security agreement because it was filed with the appropriate state office. I conclude that this constructive notice is sufficient to support the conclusion that the payment to DuPont through the receiver was not in "ordinary course."

ITT argues also that because the receiver acted improperly, i.e., for the benefit of one creditor exclusively, the payment could not be in the ordinary course. ITT argues that according to Massachusetts law a receiver takes property for the benefit of all of the creditors, not solely for one creditor. The bankruptcy court in the oral hearing on the motion for reconsideration stated that although the law may literally say that the receiver takes possession of the assets for the benefit of *all* creditors, in fact, a receiver is appointed solely to collect for the benefit of a creditor who has received a valid judgment but who cannot collect from the debtor because no attachment or trustee process procedure is available. ITT argues that because the receiver acted improperly—by not holding the assets for the benefit of all creditors—the transfer was not in the ordinary course. Neither party has called to the attention of the court any relevant precedent on this point. This appeal can be decided, however, without resolving this issue.

ITT argues that because the trustee recovered the payment to DuPont in a preference proceeding, it was necessarily established that the transfer was not in the ordinary course because one specific exception to the ability of the trustee to avoid preferential transfers is where the transfer is

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms. . . .

11 U.S.C. § 547(c). ITT therefore argues that the "ordinary course" exception to section 9–306 is inapplicable because it was necessarily decided that the payment to DuPont was not in the ordinary course.

The only reference to this issue in the appellate record is in the oral hearing be-

fore the bankruptcy court on the Motion for Reconsideration.

Mr. Stull: Okay. There's another issue, at least one more issue. One of the defenses that DuPont could have raised and maybe did raise in the trustee's preference action, was that this was not a preference, because it was a transfer in the ordinary course of business.

The Court: I don't recall that it was raised or not.

Transcript of Hearing, pp. 10–11. There is no indication that this issue was actually litigated at the preference proceeding. The only issue before the bankruptcy court, this court and the First Circuit was whether the transfer to DuPont occurred before or after the relevant limitation period. Although DuPont could have raised the ordinary course of business exception as a defense to the preference action, there is no evidence that it did raise such a defense. Consequently the mere fact that such a defense was available to DuPont has no bearing on whether the transfer will be considered in the ordinary course for purposes of section 9–306.

I have concluded in Part II–A that the payment by credit card drafts is not controlled by Comment 2(c) because the drafts were never covered into the debtor's account. I have concluded also that the transfer of funds via check No. 1005 was not in the ordinary course and thus Official Comment 2(c) is inapplicable. Accordingly I conclude that the bankruptcy court's holding that ITT could not have recovered directly from DuPont was erroneous (if the proceeds were identifiable). However, this conclusion does not end the court's inquiry because I must still determine if the Trustee's recovery in the preference action extinguished any right ITT may have had in the proceeds held by DuPont.

### III.

The bankruptcy court held that funds recovered by a trustee in a preference proceeding are not subject to any security interest in the funds that may have been attached and perfected before the petition of bankruptcy. 11 U.S.C. section 552, sub-sections (a) and (b) limit pre-petition security interests in assets acquired post-petition. Section 552 reads as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. (b) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

The bankruptcy court interpreted section 552 to mean that "preference recoveries are not subject to pre-petition security interests unless the Court, after a hearing, orders otherwise, based on the equities of the case." Preference Memorandum, p. 7. The bankruptcy court read the "except" clause as completely taking preference recoveries outside the purview of section 552(b), unless the court ordered otherwise based on the equities of the case. ITT argues, however, that the "except" clause is designed only to reinforce that those security interests *perfected within ninety days* of the commencement of the bankruptcy and voidable under section 547 are not somehow "revived" by section 552(b).

Several bankruptcy court cases have held that preference recoveries *are* subject to pre-petition security interest so long as the security interest is not otherwise voidable under section 547 or another applicable sec-

tion of the bankruptcy code listed in the "except" clause to section 552(b). *In re Cambria Clover Mercantile Co., Inc.*, 51 B.R. 983 (Bankr.E.D.Pa.1985) (holding that section 552(b) preserves a secured party's right in proceeds recovered in a section 547 preference action on the condition that the secured party's interest was perfected before the 90 day preference period); *In re Figearo*, 79 B.R. 914 (Bankr.D.Nev.1987) (same result where the trustee recovered property conveyed fraudulently).

The bankruptcy court explicitly declined to follow *Cambria* stating that "the *Cambria* interpretation of Section 552(b) [ ] ignores the unique nature of preferences [and] ... [c]ongress would not have enacted section 552(b) with its express *exclusion* of section 547 recoveries unless it so intended." Preference Memorandum, p. 7.

Section 552(b), however, does not expressly exclude "section 547 recoveries," but rather, states that "except as provided in section 547," security interests in pre-petition proceeds may extend to those proceeds post-petition depending upon applicable non-bankruptcy law, the agreement between the parties, and the equities of the case.

▮ I do not interpret "except as provided in section 547" to mean that all proceeds recovered in a preference procedure are recovered free and clear of any security interest in those proceeds. Rather, I conclude that the court in *Cambria* correctly interpreted the statute, *i.e.*, a pre-petition security interest that was attached and perfected before the ninety day period in which a trustee can avoid payments as preferential transfers, is preserved post-petition. Thus, once the court determines that the security interest was properly perfected before the ninety day period, the court looks to applicable non-bankruptcy law to determine whether the secured party was entitled to recover directly from the transferee (DuPont). If yes, then the court must decide whether the equities demand that the trustee nevertheless maintain the preference recovery.

In reaching its conclusion that ITT was not able to recover from the Trustee, the bankruptcy court did consider the equities involved. However, the court explicitly ruled that "if ITT had a right independent of the preference recovery to have recovered the funds from DuPont" the equities would be different. Preference Memorandum, p. 7. I have concluded in Parts II–A and II–B that ITT did have such an "independent right" (assuming ITT is able to prove that the proceeds are identifiable). Thus, I must hold that in addition to mis-interpreting section 552(b), the bankruptcy court did not correctly weigh the equities involved.

## IV.

I have concluded in Part II–A and II–B that Official Comment 2(c) is inapplicable both to the transfer of the American Express Credit Card drafts and to the transfer of funds via check No. 1005. I have concluded also that the recovery of the funds from DuPont by the Trustee in the preference action did not extinguish ITT's alleged interest in the funds recovered. However, I decline to render final judgment for ITT because the bankruptcy court did not make any findings (if there are disputed issues of fact to be resolved) or conclusions regarding whether the proceeds are identifiable as proceeds of any interest within ITT's security agreement with Antinarelli. In addition, the bankruptcy court must re-examine the equities involved in the case in light of my rulings in Part II–A and II–B.

The bankruptcy court's order of April 13, 1988, in *ITT v. Trustee*, 94 B.R. 227, is vacated, and the matter is remanded to the bankruptcy court for further proceedings not inconsistent with this Opinion.