SECURITY NATIONAL BANK OF SPRINGFIELD *vs.* GENERAL
MOTORS CORPORATION & another.

Hampden.    October 3, 1962. — February 8, 1963.

Present: SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Sale,* Sale in bulk. *Laches. Equity Jurisdiction,* Laches, Fraudulent
conveyance, Sale in bulk. *Fraudulent Conveyance. Assignment. Con-
tract,* Assignment. *Mortgage,* Of personal property: what constitutes.
*Pledge. Equity Pleading and Practice,* Appeal, Suit to set aside sale in
bulk.

There was no error in a suit in equity in denial of a motion to dismiss an
appeal from the final decree grounded solely on the fact that notice to
the appellant by the clerk under G. L. c. 231, § 135, that the case was
ripe for preparation of the papers was not sent until nearly a year
after the claiming of the appeal.   [439–440]

There was a violation of the sale in bulk law, G. L. c. 106, § 1, through a
sale in 1956, without observance of the requirements of § 1, of certain
automobile parts and accessories by an automobile dealer to an automo-
bile manufacturer pursuant to a provision of a "dealer selling agree-
ment" between them for sale of such property by the dealer to the
manufacturer upon termination of the agreement; and in a suit in
equity by a creditor of the dealer against the dealer and the manu-
facturer the plaintiff was entitled to have the sale set aside and the prop-
erty, or its value if it was no longer existent or available, applied to
the plaintiff's claim pro rata with the claims of other creditors of the
dealer if there were any.   [440–441]

Mere delay of about one year in a creditor's bringing a suit in equity
against his debtor and a third person to set aside a sale of property in
bulk made by the debtor to the third person in violation of the sale in
bulk law, G. L. c. 106, § 1, did not bar the suit on the ground of laches
as against the third person where no prejudice to him through the delay
appeared.   [441–442]

In a 1954 contract between an automobile manufacturer and an automobile
dealer providing for the sale of certain property by the dealer to the
manufacturer upon termination of the agreement, a further provision
that the dealer should "not transfer or assign . . . any right or obliga-
tion hereunder" was valid, so that an attempted assignment by the
dealer to a creditor of "all credits . . . to become due" from the manu-
facturer and "all moneys that may become due to the . . . [dealer]" in
such a sale to the manufacturer gave the creditor no rights against the
manufacturer.   [442]

An agreement entered into by an automobile dealer and one who lent him money, providing that the dealer as collateral security "sells, assigns, transfers and pledges" to the lender all automobile parts and accessories then in the dealer's possession and that all parts and accessories thereafter acquired by the dealer should immediately "become . . . subject to the lien of this agreement," was not effective as a chattel mortgage as against a third person where it was not recorded pursuant to G. L. (Ter. Ed.) c. 255, § 1, even if the third person had notice of it.   [442]

On the facts, a lender of money to an automobile dealer, as against an automobile manufacturer, acquired under a security agreement with the dealer and certain subsequent arrangements with him no rights by way of pledge in automobile parts and accessories which were in the dealer's possession after purchase from the manufacturer and were sold and delivered by the dealer to the manufacturer pursuant to a contract between them providing for such a sale upon termination of the contract and prohibiting the dealer from assigning "any right or obligation" thereunder; nor did the lender acquire any rights by way of pledge in the proceeds of the sale paid by the manufacturer to the dealer.   [442–443]

BILL IN EQUITY filed in the Superior Court on May 14, 1957.

The suit was heard by *Lurie, J.,* on a master's report. The plaintiff appealed from an interlocutory decree confirming the master's report and from a final decree dismissing the bill as to the defendant General Motors Corporation. That defendant appealed from decrees by *Lurie, J.,* denying its motion to dismiss an appeal of the plaintiff, and allowing a motion by the plaintiff that the dealer agreement mentioned in the opinion, an exhibit, be not reproduced in the record but be transmitted to this court.

*Joseph Swirsky* for the plaintiff.

*Raymond T. King* for the defendant General Motors Corporation.

SPALDING, J.   The plaintiff is a national banking institution in Springfield.   The defendant General Motors Corporation (defendant) manufactures automobiles and automobile parts for sale to its dealers and others throughout the United States.   The defendant Redden & Sanderson, Inc. (dealer), has a place of business in West Springfield and purchased trucks, automobile parts, and accessories from time to time from the defendant.

The plaintiff brought this bill in equity (a) to set aside an alleged sale in bulk of stock in trade and merchandise from the dealer to the defendant in violation of G. L. c. 106, § 1;[1] (b) to adjudicate the rights and title of the plaintiff in certain merchandise under an agreement made with the dealer on July 19, 1955; and (c) for an accounting of the moneys and credit due from the defendant to the dealer which the latter had assigned to the plaintiff under the July 19 agreement.

The case was referred to a master. We summarize his findings as follows: On November 24, 1954, the defendant entered into an agreement with the dealer, which was entitled "Direct 'A' Dealer Selling Agreement," and will be sometimes referred to hereinafter as the dealer agreement. Under this agreement the dealer was to sell the products of the defendant. Under § 27 thereof the defendant, upon termination of the agreement, contracted to purchase from the dealer, and the dealer contracted to sell, certain items of personal property which included trucks, parts, accessories, bodies, signs, and tools. One of the provisions provided that the dealer "shall not transfer or assign nor attempt to transfer this Agreement or any right or obligation hereunder."

The plaintiff from time to time lent various sums to the dealer and on July 19, 1955, and on March 30, 1956, notes for this indebtedness (which were renewals of prior notes) were given by the dealer to the plaintiff. On May 14, 1957 (when the present suit was commenced), $8,918.10 was due on the July 19 note, and $3,631.37 was due on the March 30 note.

At the time the note of July 19 was given, the plaintiff and the dealer entered into a security agreement which provided that the dealer "sells, assigns, transfers and pledges" to the plaintiff all its right, title, and interest "in and to all the automobile parts and accessories," then in its possession by purchase from the defendant, as collateral security for all obligations and liabilities of the dealer to the plain-

---

[1] The transactions discussed in this opinion occurred prior to October 1, 1958, and are therefore not governed by the Uniform Commercial Code. G. L. c. 106, inserted by St. 1957, c. 765, § 1.

tiff. The dealer was given the right to sell the pledged merchandise in the normal course of retail trade, but agreed that all parts and accessories thereafter purchased or acquired from the defendant should "without any further conveyance, assignment or pledge, immediately upon such acquisition become and be subject to the lien of this agreement."

As further security for its obligations to the plaintiff, the dealer also assigned and transferred to the plaintiff "all its right, title and interest in and to any and all credits now due and to become due" from the defendant, and "in and to any and all moneys that may become due to the . . . [dealer] under the agreement to repurchase by" the defendant. In case of default the plaintiff, as agent for the dealer, was given the right to exercise the dealer's rights "to collect and receive any credits or moneys that may be due" to the dealer from the defendant, and the right to enforce the dealer's rights under the repurchase clause contained in the dealer agreement. The security agreement outlined above was not recorded.

On May 8, 1956, the dealer gave a bill of sale to the defendant covering all unused and undamaged parts and accessories purchased from the defendant during the prior twelve month period.

In May of 1956, Vester, the plaintiff's president, went to the dealer's place of business and was informed by the dealer's treasurer (J. M. Redden) that the dealer was "giving up" its contract with the defendant. Vester noticed that certain parts were being packed and he informed Redden that the plaintiff had "liens on said goods" and an assignment of the proceeds therefrom. Vester requested an order on the defendant to pay the proceeds to the plaintiff. He also stated that he was taking possession of these parts for the plaintiff, but would have no objection to their being shipped to the defendant on behalf of the plaintiff provided the defendant remitted the proceeds directly to the plaintiff on an order signed by Redden. Redden said he would sign such an order if it were drawn up, but desired that it first

be approved by his counsel. Vester told Redden that he was going to hold him personally responsible for the custody of the property as agent for the plaintiff. Redden told Vester "not to worry" and that "the goods would not be shipped until everything was straightened out." "The parts were left in the same location as before this conversation and under the apparent control of . . . Redden."

Thereafter, the parts were shipped by Redden to the defendant, who did not know of this conversation between Vester and Redden. Vester discovered that the goods had been shipped and immediately communicated with T. L. Harris, the defendant's zone manager, and Harris referred Vester to the defendant's attorney. On the following day (May 25, 1956), Vester and his counsel called upon the defendant's attorney and delivered to him a copy of the July 19, 1955, security agreement between the plaintiff and the dealer. Although this agreement had been referred to in the conversation between Vester and Harris, this was the first time that the defendant had any knowledge of the exact terms of it.

On an accounting between the dealer and the defendant the sum of $13,137.35 was found to be due to the dealer, and the defendant paid this amount to the dealer (in discharge of its repurchase obligation under the dealer agreement) on or about June 29, 1956. The dealer then paid virtually all of this money to the Yellow Manufacturing Credit Corporation, one of its creditors. The plaintiff had no knowledge of the payment to the credit corporation.

After finding the foregoing facts, the master concluded that the sale of parts by the dealer to the defendant was in violation of G. L. c. 106, § 1, the so called sales in bulk act. He found, however, that with respect to this transaction the plaintiff was barred by laches. The master further found that the action of Vester under the security agreement with respect to the parts in the dealer's possession did "not amount to the taking and retaining of possession by the plaintiff" and hence did not constitute a pledge. This transaction, he found, was not effective as a chattel mort-

gage, for it was never recorded.  He also found that the plaintiff's rights under the security agreement were barred by laches.

The master's report was confirmed by an interlocutory decree and thereafter a final decree was entered dismissing the bill as to the defendant.  From these decrees the plaintiff appealed.  The defendant appealed from the denial (which we treat as a decree, see *Bressler* v. *Averbuck*, 322 Mass. 139, 143) of its motion to dismiss the plaintiff's appeal from the final decree.

### The Motion to Dismiss.

The defendant's motion to dismiss the plaintiff's appeal was grounded on alleged noncompliance with the provisions of G. L. c. 231, § 135, as amended through St. 1960, c. 171. The portions of § 135, here relevant, provide that "When any case becomes ripe for final preparation and printing of the record . . . the clerk . . . shall forthwith give to the party having the obligation to cause the necessary papers . . . to be prepared a notice by registered mail . . . stating that the case has become ripe."  Within ten days after the receipt of such notice, the party having the obligation to cause the necessary papers to be prepared "shall give to the clerk . . . an order in writing for the preparation of such papers . . . for transmission to the full court."  The plaintiff's appeal was seasonably claimed.  The plaintiff, within the time prescribed in § 135, gave to the clerk an order in writing for the preparation of the necessary papers.

The only basis for the contention that the plaintiff failed to comply with § 135 is that the appeal from the final decree was claimed on July 11, 1960, and the notice to the plaintiff by the clerk that the case was ripe was not sent until June 20, 1961, almost a year later.  But this was no fault of the plaintiff.  Its obligation to order the preparation of the necessary papers did not arise until it had been notified by the clerk that the case was ripe.  The defendant contends that the plaintiff was under a duty to prod the clerk to take action, for otherwise the defendant would be deprived of its right to have the appeal speedily heard.  Since an appeal-

ing party is under no obligation to order preparation of the papers until he receives notice from the clerk that the case has become ripe, the inactivity or neglect of a clerk with respect to such notice could result in hardship to an appellee as well as to an appellant. But the parties in such a case are not without a remedy. It would be open to any party "by simple motion in the court in which the case was pending for a direction to the clerk to take the proper steps." *Royal Tool & Gauge Corp.* v. *Clerk of Courts for County of Hampden,* 326 Mass. 390, 392. See *Cambridge Sav. Bank* v. *Clerk of Courts for County of Hampden,* 243 Mass. 424, 427–428. The motion to dismiss the plaintiff's appeal was rightly denied.

### The Merits.

We are of opinion that the conclusion of the master that the sale of the parts by the dealer to the defendant violated the sales in bulk act (G. L. c. 106, § 1) was correct. There was no compliance with the requirements of that act, and no contention is made to the contrary.

The suggestion of the defendant that there was a waiver of the violation on the part of the plaintiff need not detain us. Waiver, an affirmative defence, was not pleaded, and it is apparent that this issue was not tried out before the master, for he made no findings touching it. See *Nashua River Paper Co.* v. *Lindsay,* 242 Mass. 206, 208. The defence of waiver, therefore, is not available to the defendant.

A finding of actual fraudulent intent on the part of the defendant was not necessary to support the conclusion that the sales in bulk act had been violated. "The effect of the statute is to make . . . non-compliance [with its terms] conclusive of fraud as to the creditors of the seller." *Adams* v. *Young,* 200 Mass. 588, 591.

The defendant argues that the plaintiff should not recover because it claims all the proceeds from the bulk transfer rather than its pro rata share along with other creditors.[1] This contention does not relate to the existence of the defendant's liability under the sales in bulk act but rather

---

[1] There is no finding one way or the other as to the existence of any other creditors.

to the extent of such liability.  The defendant would be liable to the plaintiff for its pro rata share in any event. Inasmuch as the master found that the plaintiff was guilty of laches, he never reached the question of liability.  Since, as will presently appear, the case must be reheard, the plaintiff, if there were other creditors, can be limited to recovering its pro rata share out of the proceeds of the bulk transfer.  Apart, then, from the question of laches, liability was established under G. L. c. 106, § 1.

The master, however, concluded that the plaintiff was guilty of laches, and the final decree dismissing the bill as to the defendant indicates that the judge concurred in this conclusion.  The sales in bulk act, then in force, did not prescribe any time within which the proceedings to set aside the sale must be commenced.  However, it has been said that a creditor "must proceed with reasonable despatch and before the rights of intervening parties acting in good faith shall have become fixed."  *Kelly-Buckley Co.* v. *Cohen,* 195 Mass. 585, 589.  In the case at bar there are no findings which would indicate that the rights of other parties would be prejudiced by holding the defendant liable under the sales in bulk act.  Nor is there any finding that the defendant was prejudiced.  "Laches is not synonymous with mere delay.  It commonly implies also some form of prejudice or disadvantage to the defendant."  *Westhampton Reservoir Recreation Corp.* v. *Hodder,* 307 Mass. 288, 291.  *Ferrone* v. *Rossi,* 311 Mass. 591, 596.  *Norton* v. *Chioda,* 317 Mass. 446, 452.  We are of the opinion that the element of prejudice is lacking here.  The master's ultimate finding of laches appears to be based on his subsidiary findings, and these findings do not support his ultimate finding.  The subsidiary findings were that the plaintiff knew of the transfer from the dealer to the defendant in May, 1956; that payments by the defendant to the dealer and the latter's payments to Yellow Manufacturing Credit Corporation were not made until about June 29, 1956; and that the plaintiff's bill was not brought until May 14, 1957.  Although these facts indicate a delay of about twelve months in the commencement of suit, they fail to show that the defendant incurred any

prejudice or disadvantage by the delay. The finding of laches, therefore, cannot stand.

It follows that the court below erred in failing to set aside the sale under the sales in bulk act. The plaintiff is entitled to have the decree provide effective machinery to apply the stock of merchandise pro rata with other creditors, if any there are, to the plaintiff's claim, or its value if it is no longer existent or available. *Walworth Co.* v. *Locke Stevens & Sanitas, Inc.* 300 Mass. 557, 559.

We turn now to the rights of the parties under the security agreement of July 19, 1955. Under this agreement the dealer assigned to the plaintiff its rights to all money due or to become due from the defendant under the dealer agreement. Several grounds have been advanced by the defendant against recovery under the security agreement, including the master's finding of laches, but we shall consider only one, for it is fatal to recovery. The dealer's agreement contained a clause that the "Dealer shall not transfer or assign nor attempt to transfer this Agreement or any *right* or *obligation* hereunder" (emphasis supplied). Such a prohibition was lawful and invalidated the attempted assignment as against the defendant. It is "settled law that parties to a contract can agree that the contract in all its terms shall be nonassignable both at law and in equity . . . . *Old Colony Crushed Stone Co.* v. *Cronin,* 276 Mass. 221, 226." *Federal Natl. Bank* v. *Commonwealth,* 282 Mass. 442, 450. Restatement: Contracts, § 151.[1] The plaintiff, therefore, acquired no rights against the defendant by virtue of the attempted assignment.

The plaintiff rightly does not contend that the security agreement was effective as a chattel mortgage. Since the instrument was not recorded as required by G. L. (Ter. Ed.) c. 255, § 1, the defendant would not be bound by it even if it had notice. *Connecticut Valley Onion Co.* v. *Pielock,* 281 Mass. 287, 290. But the plaintiff does argue that by notifying Redden that it was taking possession of the parts, and by appointing Redden its agent to deliver the goods to the defendant under an order to the defendant to pay the pro-

---

[1] See now § 9–318 (4) of the Uniform Commercial Code.

ceeds to the plaintiff, its security interest in these parts was perfected. The parts were left in possession of the dealer under its apparent control and the master rightly found that such actions did not amount to the taking and retaining of possession of the merchandise.

The plaintiff does not contend that it acquired, as against the defendant, any rights in the parts by virtue of the security agreement alone. It does argue, however, that it acquired such an interest as a result of the arrangement between Vester and Redden in May, 1956. This contention must fail. At the time the plaintiff and the dealer entered into the security agreement the plaintiff was charged with notice of the terms of the dealer agreement; it knew that on termination of the latter agreement the dealer was duty bound to sell the parts on hand to the defendant, and it knew that the dealer was prohibited from assigning any rights or obligations arising under the dealer agreement. The plaintiff never sought to perfect its interest under the security agreement until after the rights of the defendant had matured under the dealer agreement. By the time the plaintiff purported to perfect its interest by informing the defendant of the terms of the security agreement, the latter had exercised its rights and had taken possession of the parts but had not then paid for them. The plaintiff, nevertheless, at that time was charged with notice of the prohibition against the assignment of any right or obligation under the dealer agreement. It knew, therefore, that any purported pledge of the parts to it by the dealer would derogate from the rights of the defendant. We hold, therefore, that as against the defendant the plaintiff acquired no rights in the parts or their proceeds by reason of any purported pledge.

The interlocutory decrees are affirmed.[1] The decree denying the defendant's motion to dismiss is affirmed. The final decree is reversed and the case is to stand for further hearing in conformity with this opinion.

*So ordered.*

---

[1] Since we have treated the dealer agreement as properly before us, there is no need to deal with the defendant's appeal touching this subject.