In re HALMAR DISTRIBUTORS, INC. and Ralar Distributors, Inc., Debtors.

GENERAL ELECTRIC COMPANY, LIGHTING BUSINESS GROUP, Plaintiff,

v.

HALMAR DISTRIBUTORS, INC., Ralar Distributors, Inc. and Baybank Middlesex, Defendants.

Bankruptcy Nos. 89–40976, 89–40975. Adv. No. 89–4075.

United States Bankruptcy Court, D. Massachusetts.

July 10, 1990.

George Parker, Parker & Cohen, Boston, Mass., for General Elec. Co., Lighting Business Group, plaintiff.

Paul Salvage, Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, Springfield, Mass., for Halmar Distributors, Inc., Ralar Distributors, Inc., defendants.

Charles R. Bennett, Riemer & Braunstein, Boston, Mass., for Baybank Middlesex, plaintiff-in-counterclaim.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

This is a classic struggle over security between a lender and supplier. General Electric Company, Lighting Business Group ("G.E."), a supplier of the Chapter 11 Debtors, Halmar Distributors, Inc. ("Halmar") and Ralar Distributors, Inc. ("Ralar"), has brought an adversary proceeding against the Debtors to establish the validity and priority of its interests in

the Debtors' inventory and the proceeds thereof. Asserting its own security interest in the same collateral, the Debtors' lender, BayBank Middlesex ("BayBank"), was allowed to intervene. G.E. in its amended complaint seeks damages against BayBank in an amount equal to the cash proceeds from the sale of G.E.'s products which BayBank received and paid to itself under its lending arrangement with the Debtors. Presented are novel questions of whether: (i) BayBank is liable for conversion of G.E.'s interest in these cash proceeds, (ii) G.E.'s interest in Ralar's inventory continued after the entire inventory was transferred from Ralar in New York to Halmar in Massachusetts, and (iii) G.E.'s interest in items of Halmar's inventory continued after they were commingled with identical items in Ralar's inventory. I set forth here my findings of fact and conclusions of law after trial.

The Chapter 11 Debtors, Halmar and Ralar, are affiliates owned by the same individuals. Halmar has been in business in Massachusetts for a number of years, selling at wholesale a wide variety of household and personal products to supermarkets, department stores, drugstore chains and other retail entities located throughout the northeast. Ralar was organized in 1987 to deal in hardware as well as household and personal items. It began business in Plainview, New York by purchasing the assets of a corporation bearing the same name which did business in New York as a subsidiary of Caldor, Inc. The expansion into hardware items, the dependence upon Caldor as a customer, and the resulting increased volume created a fiasco, requiring the termination of Ralar's business within two years and the transfer of its inventory in New York to Halmar in Massachusetts. The Chapter 11 filings of both corporations followed shortly thereafter. Left to sort out their respective rights are G.E. and BayBank.

G.E. has sold merchandise to Halmar since approximately 1964. The current "Distributor Agreement" between the parties, dated May 1, 1982 and amended three times, covers "Large [lamps], PLP [portable lighting products], Wiring Device Products, miniature lamps [and] product lines in Photo, Xmas and Battery." The agreement provides for the sale of some products outright to Halmar and the placing of other products on consignment with Halmar. G.E. is granted a security interest in all the products and in "all cash and non-cash proceeds of all thereof, including accounts, contract rights, chattel paper and any other rights to the payment of money and security therefor." Payment for consigned inventory sold by Halmar in any month is due on the fifteenth day of the following month, except for inventory covered by a so-called deferred payment agreement, for which payment is due twelve months after sale out of consignment. The agreement specifies that products sold outright to Halmar are to be paid for under normal billing terms. It places no restrictions upon the use of proceeds from the sale of any of the products. Financing statements were filed in the appropriate offices in Massachusetts on or about January 8, 1976; successive continuation statements were duly filed on or about November 21, 1980, and November 4, 1985. The description in the financing statements, however, refers only to lamps and bulbs, reading:

> A—Inventory consisting of electric lamps or light bulbs (light bulbs, tubes, and other types of electric lamps) sold or consigned to the debtor by General Electric Company, including, without limitation, incandescent lamps, fluorescent lamps, high intensity discharge lamps, quartz lamps and accessories or parts relating thereto; and

> B—Accounts receivable, contract rights, chattel paper, and any other right to the payment of money and security therefor, arising from the sale, consignment, or other transfer by the debtor of said lamps, accessories or parts.

In August of 1989, about two months prior to the Chapter 11 filings, Halmar signed and G.E. filed in the appropriate Massachusetts filing offices amended financing statements containing this broader description:

A. Inventory Consisting of Lamps and Light Bulbs (Including, Without Limitation, Incandescent, Fluorescent, High Intensity Discharge, Quartz, Photo, Miniature, Holiday and Accessories And Parts Relating Thereto), Ballasts, Wiring Devices, And Portable Lighting Products Now Or Hereafter Sold Or Consigned To The Debtor By General Electric Company; and B. Accounts Receivable, Contract Rights, Chattel Paper, And Any Other Right To The Payment Of Money And Security Therefor, Now Or Hereafter Arising From The Sale, Consignment Or Other Transfer By The Debtor Of Said Inventory; C. Proceeds of "A" and "B".

On December 1, 1987, G.E. signed the same form of distributor agreement with Ralar, the new corporation organized to do business in New York. Included within this agreement were the following product lines: "Large [lamps], Photo [lamps], Miniature [lamps], Holiday [lamps], Battery, PLP, Wiring Device." On or about February 1, 1988, Ralar executed and G.E. filed financing statements with the appropriate filing offices in New York containing the following description:

A) Inventory Consisting of Lamps and Light Bulbs (Including Without Limitation, Incandescent, Fluorescent, High Intensity Discharge, Quartz, Photo, Miniature, Holiday and Accessories And Parts Relating Thereto), Ballasts, Wiring Devices, And Portable Lighting Products Now Or Hereafter Sold Or Consigned To The Debtor By General Electric Company; And B) Accounts Receivable, Contract Rights, Chattel Paper, And Any Other Right To The Payment Of Money And Security Therefor, Now Or Hereafter Arising From The Sale, Consignment Or Other Transfer By The Debtor Of Said Inventory. C) Proceeds of "A" and "B".

For many years, Halmar had a revolving loan agreement with Shawmut Bank of Boston, N.A. ("Shawmut"), which on March 27, 1989 was replaced by BayBank. On that date, Halmar and Ralar entered into a financing arrangement with BayBank involving a $3 million note and an agreement for a revolving line of credit under which loans were to be made in amounts determined by a formula based upon current inventory and account receivable levels. Halmar and Ralar informed BayBank that G.E. supplied them with light bulbs on consignment; BayBank consequently excluded light bulbs from the inventory borrowing base. BayBank was also aware of the contents of G.E.'s filed financing statements. BayBank obtained and perfected by appropriate filings in Massachusetts and New York a security interest in, among other things, all of the Debtors' accounts, inventory, chattel paper, equipment, fixtures, goods, and general intangibles, and the "proceeds" thereof. The loan documents required that Halmar and Ralar direct their customers to make all payments to a lock box under the control of BayBank; the checks were to be endorsed to BayBank, who would apply them against its debt. BayBank was to periodically advance new funds to the borrowers in accordance with the borrowing formula; Halmar and Ralar were authorized to use the funds in their business in their discretion.

The parties operated under this arrangement during the ensuing months in 1989 until the Chapter 11 filings on October 16, 1989. Included among the customer payments received by BayBank in the lock box were proceeds from the sale of various products which G.E. had sold or consigned to Halmar and Ralar. G.E. was aware over the years that Halmar had a similar revolving loan arrangement with Shawmut. It learned in September of 1989 that BayBank had taken over the financing of the Debtors.

After Halmar was unsuccessful in its attempt to sell its business during the Chapter 11 proceedings, I permitted BayBank to foreclose upon its collateral, subject to any rights of G.E., which have been protected by two orders requiring BayBank to hold in escrow proceeds from the sale of G.E. products. G.E. asserts claims against the Debtors totaling $2,201,220.29. As of May 5, 1990, BayBank held in escrow $436,661.07 of proceeds from the sale of G.E. products, pending resolution of the parties'

rights thereto. These proceeds, plus additional sales of $30,902.44 uncollected as of May 5th, represent the following sales of G.E. products between September 15, 1989 and March 31, 1990:

| | |
|---|---|
| Wiring Devices | $235,493.49 |
| Batteries | 11,801.69 |
| Auto Head Lamps | 50,257.88 |
| Light Bulbs | 170,010.45 |
| Total | $467,563.51 |

## I. G.E.'s CLAIM AGAINST BAYBANK FOR CONVERSION OF CASH PROCEEDS

G.E. seeks to hold BayBank liable in damages for having paid itself from checks representing customer payments for the purchase of G.E. products. Although G.E. carefully avoids use of the term "conversion," only principles of conversion could support this charge. I conclude that there has been no conversion, for three independent reasons. First, G.E. lost its security interest in cash proceeds. Second, even if it held a security interest in these proceeds, there was no conversion. Finally, under the doctrine of laches, G.E. is barred from asserting its claim.

### A. *Security Interest in Cash Proceeds*

■ If G.E. retained a security interest in these checks, it would have priority over BayBank's security interest by reason of G.E.'s earlier filing. MASS.ANN.LAWS. ch. 106, § 9–312(5) (Law.Co-op.1984). G.E.'s prior filing does not prevent BayBank from being a holder in due course of the checks. MASS.ANN.LAWS. ch. 106, §§ 3–304(5), 9–309 (Law.Co-op.1984). BayBank, however, had actual, not just constructive, notice of G.E.'s security interest in the checks when it saw G.E.'s filed financing statements, so that BayBank did not become a holder in due course. MASS. ANN.LAWS. ch. 106, § 3–302 (Law.Co-op. 1984). Nor does BayBank's security interest in the checks give it priority over G.E. as the result of BayBank's possession of the checks, pursuant to § 9–304 requiring that perfection of a security interest in instruments be accomplished only by possession. Section 9–304 expressly makes that rule subject to § 9–306, dealing with disposition of collateral and proceeds.

The rights of the parties therefore depend upon the deceptively simple provisions of § 9–306(1), (2) and (3). We are not concerned with subsection (4) of § 9–306 on rights in proceeds in existence at the commencement of insolvency proceedings; G.E. bases its claim upon its interest in the proceeds in existence on earlier dates. Section 9–306(1), (2) and (3) provide in pertinent part:

(1) "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds ... Money, checks, deposit accounts, and the like are "cash proceeds." All other proceeds are "non-cash proceeds."

(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless ... a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds ...

MASS.ANN.LAWS ch. 106, §§ 9–306(1), (2) and (3) (Law.Co-op.1984).

It is clear, first of all, that G.E. lost its security interest in its various products upon their sale by the Debtors in the ordinary course of their business. G.E. certainly "authorized" the sales when it sold or consigned the products to the Debtors, parties in the business of selling such products. This is confirmed by § 9–307(1)(a), which provides that a "buyer in the ordinary course of business ... takes free of a security interest created by his seller even though the security interest is perfected

and even though the buyer knows of its existence ..." MASS.ANN.LAWS ch. 106, § 9–307(1)(a) (Law.Co-op.1984). But that does not end the matter, because G.E.'s security and consignment agreement expressly includes "cash and non-cash proceeds ... thereof, including accounts." Even if it did not, under § 9–306(2) G.E.'s security interest automatically "continues in any identifiable proceeds including collections received by the debtor."

G.E.'s security interest in the customer checks was nevertheless a transitory one. Because cash and non-cash proceeds were expressly included in the description of G.E.'s collateral, the reference in § 9–306(2) to the "disposition" of "collateral" encompasses these checks. And their pre-arranged payment to BayBank was a disposition "authorized ... otherwise," so that it has the same consequences as the authorized transfer of the merchandise itself. By placing no restriction on the use of cash proceeds, G.E. necessarily authorized their general use by the Debtors in their business. Even a consent to a transfer of collateral conditioned upon immediate payment following the collateral's transfer has been held to be authorization under § 9–306(2). *See, e.g., First Nat'l Bank And Trust Co. of Oklahoma City v. Iowa Beef Processors, Inc.*, 626 F.2d 764, 769 (10th Cir.1980); *Moffat County State Bank v. Producers Livestock Marketing Ass'n*, 598 F.Supp. 1562, 1568 (D.Colo. 1984). Here, G.E. merely expected payment according to normal credit terms in most instances and a year after sale out of consignment if the merchandise was included in the deferred payment program.

Although part of the original collateral, these checks were also proceeds of accounts, which in turn were proceeds of inventory. The consequences, however, are no different. Because subsections (2) and (3) make identifiable proceeds automatically subject to G.E.'s security interest, the reference in § 9–306(2) to the authorized disposition of "collateral" necessarily includes proceeds; § 9–105(1)(c) defines "collateral" as "property subject to a security interest ..." MASS.ANN.LAWS ch. 106, § 9–105(1)(c) (Law.Co-op.1984).

Additional support for this interpretation is provided by § 9–306(3), which employs the phrase "original collateral" when referring to collateral exclusive of proceeds. It is also supported by the reference in comment 3 to the unauthorized disposition of instruments in which a security interest is perfected, an obvious reference to the disposition of proceeds. The transfer of proceeds in the ordinary course of business thus has the same consequences as ordinary course transfers of original collateral. Comment 2(c) to § 9–306 bears this out; it provides:

> Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfer in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

MASS.ANN.LAWS ch. 106, § 9–306 comment 2(c) (Law.Co-op.1984).

The draftsmen clearly had in mind the same policy with respect to cash proceeds as was adopted by §§ 9–306(2) and 9–307(1)(a) with respect to goods—that a transfer in the ordinary course of a debtor's business terminates a security interest in the property transferred. A different policy for proceeds certainly makes no sense. The direct payments made to BayBank through the lock box arrangement were surely in the ordinary course of business of Halmar and Ralar. Although § 9–306's comment 2(c) envisions only transfers out of the Debtor's checking account, a comment, unlike a statute, enunciates a principle which should not be confined to the precise example used in the comment, as suggested by the phrase "of course" used in the comment.

*Barber–Greene Co. v. Nat'l City Bank of Minneapolis*, 816 F.2d 1267 (8th Cir. 1987), cited by G.E., dealt with a fact pat-

tern quite different from that present here. The cash transfers to the bank in that case, far from being in the ordinary course, were precipitated by the debtor's deteriorating financial condition. The bank set off all of the debtor's deposit accounts, not just the collateral account, in payment of its indebtedness. It did so because of the debtor's defaults. Nor was there any of the consent and acquiescence which is present here. The secured party had a floor plan arrangement involving large items of inventory whose sales proceeds were apparently to be applied in immediate payment to the secured party. True, the *Barber–Greene* court did seem to believe that a security interest in cash proceeds could be terminated only through payments ·out of the debtor's checking account. But it was presented with conduct amounting to foreclosure, and the decision should be read in that light. *ITT Commercial Finance Corp. v. Cullen (In re Antinarelli Enterprises, Inc.),* 107 B.R. 410, 414 (D.Mass. 1989), on the other hand, emphasizes the extraordinary nature of the payments which were there made out of the debtor's checking account to an attorney appointed as a receiver by a state court as the result of the debtor' nonpayment of a judgment.

■ Moreover, because these proceeds were received by BayBank in its own right and not by the Debtors, they would never become part of G.E.'s collateral as proceeds under § 9–306(2). The statute grants a continuing security interest only in "identifiable proceeds including collections *received by the debtor*." [Emphasis added]. There is a split of authority on whether "received by the debtor" modifies "proceeds" or "collections." *Compare, e.g., Moister v. Nat'l Bank of Georgia (Matter of Guaranteed Muffler Supply Co., Inc.),* 1 B.R. 324, 328 (Bankr.N.D.Ga.1979) (the word "including" implies that proceeds are more than collections received by the debtor) *with First Interstate Bank of Denver v. Arizona Agrochemical Co.,* 731 P.2d 746 (Colo.Ct.App.1986) (security interest continues only in identifiable proceeds in hands of debtor). The Seventh Circuit, although not deciding the question, points out that the drafting history shows that the phrase "including collections" was inserted into the 1956 version of § 9–306(2) only for clarity, which supports the interpretation that all proceeds must be received by the debtor if the security interest is to attach automatically. *See Centerre Bank, N.A. v. New Holland Div. of Sperry Corp.,* 832 F.2d 1415, 1419–20 (7th Cir.1987). I am persuaded by this history, and I conclude that G.E. had no security interest in the checks as proceeds for the additional reason that they were never received by the Debtors.

### B. *Conversion*

■ There are less technical reasons for BayBank not being liable for conversion. Restatement (Second) of Torts § 222A (1965) defines conversion as follows:

(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay' the other the full value of the chattel.

(2) In determining the seriousness of the interference and the justice of requiring the actor to pay the full value, the following factors are important:

(a) the extent and duration of the actor's exercise of dominion or control;

(b) the actor's intent to assert a right in fact inconsistent with the other's right of control;

(c) the actor's good faith;

(d) the extent and duration of the resulting interference with the other's right of control;

(e) the harm done to the chattel;

(f) the inconvenience and expense caused to the other.

*Id.*

What was done by BayBank fails to meet any of these criteria. G.E.'s contractual arrangement with the Debtors created no right in G.E. to control the proceeds. G.E. required payment only under credit terms and not by in-kind remittance of proceeds. It received payment of hundreds of thousands of dollars in this fashion under the Debtors' loan agreement with BayBank.

BayBank, moreover, acted in good faith throughout, without any intent to assert rights inconsistent with G.E.'s non-existent right of control. BayBank's payment of the proceeds to itself is of course the ultimate act of control, but these payments were but a preamble to subsequent loans which enabled the Debtors to pay G.E. and others. In light of all of the attendant circumstances, there was no conversion. *See, e.g, Berry v. Boat Giannina B., Inc.,* 460 F.Supp. 145, 148 (D.Mass.1978) (unintentional entangling of fishing vessel's net with lobster traps and consequent hauling of traps held not conversion). *Compare Centerre Bank, N.A. v. New Holland Division of Sperry Corp.,* 832 F.2d 1415, 1423 (7th Cir.1987) (foreclosure upon non-cash proceeds deemed in defiance of another's security interest and therefore conversion); *Producers Cotton Oil Co. v. Amstar Corp.,* 197 Cal.App.3d 638, 652–53, 242 Cal. Rptr. 914, 5 U.C.C.Repr.Serv.2d (Callaghan) 32, 44–45 (Ct.App.1988) (secured party's requirement that cash proceeds be remitted to it preserved its rights therein).

#### C. *Laches*

■ G.E. has slept on any rights that it may have had. For many years, it took no action to enforce any interest in cash proceeds, letting Halmar and its lenders deal with proceeds without objection. It knew that Halmar had a lending relationship with Shawmut involving a security interest in inventory and its proceeds. On October 23, 1978, it notified Shawmut that it had or expected to require a purchase money security interest in lamps and light bulbs, and their proceeds, thus preserving its priority in this collateral under § 9–312(3). MASS. ANN.LAWS ch. 106, § 9–312(3) (Law.Co.-op.1984). Halmar's agreement with Shawmut was the same type of revolving loan agreement which it entered into with BayBank, involving direct application of the cash proceeds from the sale of G.E. and other products to Shawmut in payment of its indebtedness. This is a common lending procedure whose details were either known to G.E. or easily discoverable by it. Yet G.E. asserted no claims against Shawmut throughout many years, other than the standard notice required under § 9–312(3). Nor did it seek to change BayBank's lending procedures when it learned in September of 1989 that BayBank had replaced Shawmut the previous March. This inaction has greatly prejudiced BayBank. G.E.'s conversion claim against BayBank was enhanced each time that BayBank applied the customer checks to its debt.

■ Under the doctrine of laches, a right is lost if one unreasonably delays in the assertion of that right to the prejudice of the other party. *Security Nat'l Bank of Springfield v. General Motors Corp.,* 345 Mass. 434, 441, 187 N.E.2d 820 (1963); *Garfield v. Garfield,* 327 Mass. 529, 534, 99 N.E.2d 645, 648 (1951); *Stewart v. Finkelstone,* 206 Mass. 28, 92 N.E. 37 (1910); *Yetman v. City of Cambridge,* 7 Mass. App.Ct. 700, 708, 389 N.E.2d 1022, 1027 (1979); 28 AM.JUR 2D *Estoppel and Waiver,* § 32 (1966). That is precisely what has occurred here. It would be most unfair to allow such a claim at this late date. G.E. has lost any conversion rights which it might otherwise have, under the doctrine of laches, which BayBank has raised as an affirmative defense. Although an equitable doctrine in origin, laches is equally applicable to a purely legal claim such as a one for conversion. *Jamesbury Corp. v. Worcester Valve Co.,* 443 F.2d 205, 210 (1st Cir.1971); *Turner v. Guy,* 2 Mass.App.Ct. 343, 346, 311 N.E.2d 921, 923 (1974). G.E. frames its case against BayBank, moreover, in terms of a request for an accounting, which is equitable relief.

#### II. CONTINUATION OF G.E.'S INTEREST IN RALAR MERCHANDISE TRANSFERRED TO HALMAR IN MASSACHUSETTS

■ G.E.'s perfected security interest in the Halmar merchandise is limited to lamps, including auto head lamps, and light bulbs, and the proceeds thereof. I attach no significance to the filings containing a broader collateral description which G.E. made against Halmar in August of 1989; this was after BayBank's filings. G.E. therefore wishes to preserve the security

interests created by the broader description of collateral contained in its agreement with Ralar and in the Ralar financing statements filed in New York, which includes batteries and wiring devices, whose sales proceeds are also now held in escrow.

All of Ralar's merchandise was transferred in 1989 from Plainview, New York to Halmar's new, computerized warehouse in East Longmeadow, Massachusetts, where it was entered into Halmar's computer. Many of the items were identical to items already in Halmar's inventory. No attempt was made to keep the Ralar merchandise separate from Halmar's merchandise, either physically or in the records of the computer. The merchandise was thereafter treated as Halmar's inventory, and the separate identity of Ralar was ignored. Shortly after the inventory transfer, Ralar terminated the employment of all its personnel except for a few salespeople.

When collateral in which a security interest is perfected by filing is brought from another state into Massachusetts, the perfection obtained by filing elsewhere continues for only four months after the transfer (or until the earlier expiration of the effective period for the out-of-state filing) unless a new filing is made in Massachusetts during the four month period. MASS.ANN. LAWS ch. 106, § 9–103(1)(d)(i) (Law.Co-op. 1984). Although the precise date (or dates) when this inventory was transferred is not apparent, it seems clear that the transfer was completed by July 3, 1989, and I so find. The July 3rd inventory status report for Halmar and Ralar indicates that by that date all Ralar inventory had been entered into the Halmar computer. And on July 7, 1989, Halmar wrote to G.E. stating that it was accepting Ralar's consigned inventory and notifying G.E. of the "new location" in East Longmeadow. G.E. filed against Ralar in Massachusetts on November 7, 1989. As permitted by § 9–402(2)(a), the financing statements were signed by only G.E. But the filing took place more than four months after removal to Massachusetts.

G.E.'s security interest is not saved by a tolling of the four month period as a result of the filing of the Debtors' Chapter 11 petitions on October 16, 1989, within the four month period. The only provision for tolling by a bankruptcy filing is contained in § 9–403(2), which provides:

(2) Except as provided in subsection (6) a filed financing statement is effective for a period of five years from the date of filing. The effectiveness of a filed financing statement lapses on the expiration of the five year period unless a continuation statement is filed prior to the lapse. If a security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of sixty days or until expiration of the five year period, whichever occurs later. Upon lapse the security interest becomes unperfected, unless it is perfected without filing. If the security interest becomes unperfected upon lapse, it is deemed to have been unperfected as against a person who became a purchaser or lien creditor before lapse.

MASS.ANN.LAWS ch. 106, § 9–403(2) (Law.Co-op.1984).

The statute obviously applies only to the five year effective period generally applicable to financing statements. There is no comparable provision which tolls the running of the four month filing period allowed after a removal from out of state. Prior to the 1972 amendments, § 9–402(2) contained no such provision, and yet a majority of courts held that insolvency proceedings tolled the five year period. *E.g., United States v. Freeland (In re Chaseley's Foods, Inc.),* 30 B.R. 452, 455 (N.D. Ind.), *aff'd.,* 726 F.2d 303 (7th Cir.1983); *Bond Enterprises, Inc. v. Western Bank of Farmington (In re Bond Enterprises, Inc.),* 54 B.R. 366, 370 (Bankr.D.N.M.1985); *Matter of Funding System Asset Management Corp.,* 38 B.R. 351, 352 (Bankr.W.D. Pa.1984); *Old Stone Bank v. South County Motel Corp. (In re South County Motel Corp.),* 19 U.C.C.Rep.Serv. (Callaghan) 1254, 1257–58 (Bankr.D.R.I.1976). These decisions reason that the rights of parties should be frozen as of the time of a bankruptcy filing, and that doing so is consist-

ent with the purpose of the U.C.C.'s filing requirements—public notice. Under the same reasoning, this court has held that a bankruptcy filing tolls the period permitted for the renewal of a real estate attachment in Massachusetts. *In re Paul,* 67 B.R. 342, 346 (Bankr.D.Mass.1986).

The four month filing period applicable to removals out of state presents different considerations. Unlike the circumstances under § 9–403(2), there is no filing in existence in the state where the collateral is located. Creditors thus have no ready notice of the security interest. They would first have to discover that collateral had been transported from elsewhere, and then search the filings in the first state, a burden which conflicts with the policy of public notice through filing. The four month period was selected because it "is long enough for a secured party to discover in most cases that the collateral has been removed and refile in this state ..." MASS.ANN. LAWS ch. 106, § 9–103 comment 7 (Law. Co-op.1984). Parties who obtain liens prior to the refiling are subject to the earlier security interest so long as the filing is made within the four month period, even though there is no prior public notice in the state of removal of the earlier security interest. That disadvantage should not be extended through the course of a bankruptcy proceeding. If it were, security rights in collateral would remain uncertain for an extended period. It is of course true that a secured party who has filed in another state would be likely to make his claims known early in the bankruptcy, as happened here. But he may not. Nor is a tolling required here by the general policy in favor of freezing security rights at the commencement of bankruptcy. There is an express exception to the automatic stay for filings having a retroactive effect, which would include a filing within four months under § 9–103(1)(d). *See* 11 U.S.C. § 362(b)(3). There is no tolling here. *Borg–Warner Acceptance Corp. v. Twelves (In re Utah Agricorp, Inc.),* 12 B.R. 573, 578 (Bankr.D.Utah 1981) (holding that "there is no legal basis for the tolling of the Section 9–103 grace period."). G.E.'s claim is therefore limited to the es-crowed proceeds from the sale of Halmar's lamps, including auto head lamps, and light bulbs.

## III. IDENTIFICATION OF HALMAR GOODS SUBJECT TO G.E.'S SECURITY INTEREST

■ There is a final conundrum—the problem of identification caused by the Debtors' failure to segregate Ralar's goods from those of Halmar. The problem is exacerbated by the lapse of time between the date of transfer and the date when BayBank began keeping track of the sales proceeds of G.E.'s goods pursuant to this court's orders. During that interval, many of the goods were obviously sold; we have no idea which ones were sold and whether they originally belonged to Halmar or Ralar.

We do know, however, that on July 3, 1990 Halmar had in inventory, not received from Ralar, auto head lamps (also called mini lamps) at a cost value of $215,006, and large lamps at a cost value of $361,447. Neither Halmar nor Ralar then had light bulbs in inventory. As of May 5, 1990, BayBank held in escrow about $50,000 of proceeds from the sale of auto head lamps and about $170,000 of proceeds from the sale of light bulbs, and no proceeds from the sale of large lamps. Because no light bulbs were transferred from Ralar to Halmar, and because Ralar had no independent operations after July 3rd, the $170,000 of light bulb proceeds is necessarily all from the sale of Halmar inventory. The $50,000 of proceeds from the sale of auto head lamps could be the proceeds of the inventory of either corporation, and more likely some of each. The transfer and commingling was certainly not the fault of G.E., which consented to none of this. Because Halmar had much more than $50,000 of auto head lamps in inventory, it seems just to presume that the proceeds from none of Ralar's auto head lamps have been placed in escrow, that is, that its auto head lamps were all sold prior to the escrow. Identification of collateral through such a presumption is analogous to the lowest intermediate balance theory applied in the trac-

**338**

ing of cash proceeds of collateral which have been deposited and commingled in a bank account. Under that theory, the bank account is treated as consisting of proceeds to the full extent of the proceeds deposit until its balance drops below the amount of the deposit, on the presumption that the other funds were first withdrawn. *Ex Parte Alabama Mobile Homes, Inc.*, 468 So.2d 156, 40 U.C.C.Rep.Serv. (Callaghan) 1898 (Ala.1985); *Bank of Kansas v. Hutchinson Health Services, Inc.*, 12 Kan.App.2d 87, 735 P.2d 256, 3 U.C.C.Rep.Serv.2d (Callaghan) 1537 (1987); B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* § 10.03 (1988). The presumption is borrowed from that employed in the law of trusts for the purpose of tracing trust funds. *Id.* It is particularly appropriate for analogous use here, where the unauthorized transfer and commingling of G.E.'s Ralar collateral is even more similar to a breach of trust than is the permissible commingling of proceeds in a bank account.

## IV. CONCLUSION

G.E.'s perfected security interest in Ralar's goods has terminated. G.E. is entitled to the proceeds from the sale of Halmar's lamps and bulbs, and to no portion of the proceeds from the sale of batteries and wiring devices. As of May 5, 1989, BayBank held escrowed lamp and bulb proceeds of about $220,000. The court's prior orders required that the escrowed funds be placed at interest, which BayBank neglected to do until March 27, 1990. I will add $3,500 as an appropriate increment in lieu of the interest which these funds should have earned. A separate judgment has issued in accordance with this opinion establishing the parties' rights in the escrow and dismissing G.E.'s claim for conversion.