**BARBER–GREENE COMPANY, Appellee,**

v.

**NATIONAL CITY BANK OF MINNEAPOLIS, Appellant.**

No. 86–5219.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1987.

Decided April 27, 1987.

Kevin M. Busch, Minneapolis, Minn., for appellant.

Stephen H. Cohen, Minneapolis, Minn., for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

National City Bank of Minneapolis appeals from a judgment entered upon a jury verdict in favor of Barber-Greene Company. The dispute at trial was whether Barber-Greene's security interest in the proceeds from the sale of inventory by a common debtor is superior to the security interest claimed by the bank.

Although Barber-Greene filed its financing statement approximately five years before the bank filed its statement, Barber-Greene's statement did not contain the debtor's signature. Instead, one of Barber-Greene's managers signed his name on the line below the debtor's typewritten name. The jury was instructed that Barber-Greene's financing statement was nevertheless valid if the debtor "adopted" the signature before the bank filed its statement. By special verdict, the jury indicated that it found the debtor had so adopted the signature on Barber-Greene's financing statement, rendering Barber-Greene's security interest in the proceeds superior to the bank's interest. Issues concerning the proceeds were reserved for post-trial determination by the magistrate.[1]

1. By consent of the parties and pursuant to 28 U.S.C. § 636(c), this matter was tried before the

The magistrate found that the proceeds are identifiable and that Barber-Greene is entitled to them. On appeal, the bank contends that the magistrate erred in failing to instruct the jury that the adoption, to be effective, must be in writing. The bank also contends that the magistrate erred in concluding that Barber-Greene is entitled to the proceeds in question. For the reasons discussed below, we affirm.

## I. BACKGROUND

Barber-Greene sold machinery on credit to Zeco Company pursuant to "floor-plan agreements" and "dealer agreements." Zeco, in turn, resold the machinery to its customers. Zeco granted Barber-Greene security interests in the machinery that it purchased pursuant to the agreements. Zeco and Barber-Greene had done business this way for several years.

In 1973, the bank entered into a credit agreement with Zeco whereby the bank extended loans to Zeco secured by all Zeco's inventory. The bank set up three accounts, which the parties refer to as the "collateral account," the "loan account," and the "general operating account." Pursuant to the terms of their agreement, the proceeds from the sale of all Zeco's inventory were deposited in the collateral account. The bank periodically, and at its discretion, transferred funds from the collateral account to the loan account, reducing Zeco's loan balance accordingly. Zeco operated its business out of the general operating account. Upon Zeco's request for credit, the bank, if sufficient collateral existed, would credit an amount to Zeco's general account and debit the loan account accordingly. The bank, attempting to perfect its security interest, filed a financing statement with the state on June 18, 1973.

Barber-Greene had filed a similar financing statement almost five years earlier on July 31, 1968. The statement covered all machinery sold to Zeco. Barber-Greene's financing statement, however, did not carry the signature of the debtor, Zeco. Instead, under Zeco's typewritten name was the signature of one of Barber-Greene's managers.

This dispute arose in June 1980 when, after Zeco's financial condition had deteriorated, the bank applied the balances in all Zeco's accounts, including the collateral account, to Zeco's debt. Barber-Greene claimed that the collateral account contained the proceeds from two sales of machinery in which it held security interests—the Ulland sale ($78,000) and the Duinick sale ($64,485). Barber-Greene maintained that its financing statement was filed first, and therefore its security interest in the proceeds from the two sales is superior to the security interest claimed by the bank. The bank, on the other hand, maintained that Barber-Greene's prior financing statement is invalid and ineffective without the debtor's signature. Alternatively, the bank maintained that the proceeds in question are unidentifiable, and therefore Barber-Greene is not entitled to relief.

The magistrate informed the jury that in these circumstances a security interest may be perfected by filing a valid financing statement, and that when two such statements covering the same collateral exist, the first one filed has priority. The magistrate explained that a valid financing statement must be, among other things, signed by the debtor. "Signed," he explained, is defined by the Uniform Commercial Code to include "any symbol executed or adopted by a party with present intention to authenticate a writing." The jury was told that it must determine whether the signature by Barber-Greene's manager was adopted by Zeco with the intent to authenticate the financing statement. The jury was instructed: "[i]f you find that Zeco intended the financing statement to be valid and expressed that intent by word or deed you may find that Zeco adopted the signing shown, and therefore signed the financing statement."

The bank requested an instruction that an adoption, ratification, or authorization of the signature on a financing statement is effective only if signed by the debtor. This request was denied.

The jury, by special verdict, found that (1) Zeco knowingly authorized Barber-

Honorable Patrick J. McNulty, United States Magistrate for the District of Minnesota.

Greene to sign a financing statement on its behalf, and (2) before the bank filed its statement Zeco had adopted the signature on Barber-Greene's statement with the present intent to authenticate the statement. Accordingly, Barber-Greene's security interest is superior to the bank's interest.

The parties had agreed that the issues concerning the proceeds to be recovered by the prevailing party would be decided by the magistrate. The magistrate held that Barber-Greene was entitled to the proceeds from both the Ulland and Duinick sales. The magistrate found, contrary to the bank's argument, that the lowest intermediate balance principle is inapplicable in this case and that the proceeds are identifiable. The proceeds were paid directly to the bank when deposited in the collateral account. The magistrate concluded, therefore, that the bank as an inferior creditor was not entitled to the proceeds. This appeal followed.

On appeal, the bank contends that the magistrate erred in failing to instruct the jury that a debtor's adoption of a signature must be in writing. The bank cites no authority for its position, but argues that requiring a written adoption in these circumstances avoids the issues of authentication, authority, and fraud that the Uniform Commercial Code was intended to eliminate and promotes the certainty and predictability that the Code was intended to establish. The bank also contends that the magistrate erred in holding that Barber-Greene is entitled to the proceeds in question. The bank argues that the deposits in the collateral account were "payments" to the bank and as such cut off any rights of Barber-Greene to the proceeds and rendered the proceeds unidentifiable. The bank also argues that even if the proceeds are identifiable, Barber-Greene's security interest was extinguished by Zeco's subsequent use of the proceeds.

## II. DISCUSSION

### A. Adoption

■ A valid and effective financing statement must be, among other things, signed by the debtor. Minn.Stat.Ann. § 336.9–402(1) (1987). " 'Signed' includes any symbol executed or adopted by a party with present intention to authenticate a writing." *Id.* § 336.1–201(39). The term "adopted" is not defined in the Code. The jury was instructed that it could consider Zeco's words or conduct when determining whether Zeco adopted the signature on the financing statement. The magistrate specifically denied the bank's request for an instruction that the adoption, ratification, or authorization must be in writing.

We normally defer to the trial court's rulings on questions of the law of the state in which it sits. *McAninch v. Traders National Bank,* 779 F.2d 466, 469 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 2917, 91 L.Ed.2d 545 (1986). The bank does not contend that the magistrate's view of Minnesota's version of the U.C.C. is contrary to any reported opinion of the Minnesota Supreme Court. Indeed, the bank maintains that the issue whether an adoption of a debtor's signature should be in writing is one of first impression. When the state's highest court has not decided the issue, the trial court's interpretation "is entitled to substantial deference unless it is 'fundamentally deficient in analysis or otherwise lacking in reasoned authority.' " *Dabney v. Montgomery Ward & Co.,* 761 F.2d 494, 499 (8th Cir.) (quoting *Kansas City Power & Light v. Burlington Northern R.R.,* 707 F.2d 1002, 1003 (8th Cir.1983)), *cert. denied,* —— U.S. ——, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). We hold that the magistrate's ruling that the adoption need not be in writing is not violative of the above principle.

The Code does not require a written adoption. Had the drafters intended that the adoption be in writing, we think they would have specifically expressed such a requirement. Even though a written adoption may be preferable, the Code does not so provide and, in fact, indicates to the contrary. We are not at liberty to rewrite legislation.

Further, the magistrate's ruling is consistent with the underlying purposes and

policies of the Code, both in general and specifically with the purpose and policy of the section defining the term "signed." We think that allowing an adoption to be by word or deed "permits the continued expansion of commercial practices through custom, usage and agreement of the parties," a policy expressed by the drafters in section 336.1–102(2)(b). The bank argues that requiring a written adoption would provide a simple test of authentication that would be consistent with the stated purposes of the Code "to simplify, clarify and modernize the law of commercial transactions." Minn.Stat.Ann. § 336.1–102(2)(a). While the bank's argument is persuasive, it is contrary to the underlying purpose and policy of the Code's definition of "signed" as reflected in the Official Comment. Comment 39 states that "[n]o catalog of possible authentications can be complete and the court must use common sense and commercial experience in passing upon these matters." U.C.C. § 1–201, Comment 39. *See* Minn.Stat.Ann. § 336.1–201, Comment 39 (citing U.C.C. Comment 39). Therefore, the drafters clearly did not intend to limit the manner in which adoptions or authentications are made. To require that adoptions must be made in writing would be contrary to this intent.[2]

The magistrate's ruling is also consistent with the ordinary meaning of "adopted." Unless otherwise defined, statutory words will be interpreted as taking their ordinary, contemporary, common meaning. "Adopt" means "[t]o take and follow (a course of action, for example) by choice or assent, * * * [t]o take up and make as one's own," or "[t]o take on or assume." The American Heritage Dictionary 80 (2d ed. 1982). Although the ordinary meaning does not exclude a written adoption, it does not necessarily require a writing. On the other hand, the ordinary meaning necessarily contemplates some sort of action or conduct on the part of the adopter. *See Bene-*

dict *v. Lebowitz*, 346 F.2d 120, 122 (2d Cir.1965) (creditor had not signed the financing statement but court held that the act of typing in the name coupled with subsequent act of filing the statement indicated creditor's intent to authenticate).

Finally, we note that the instruction in the Official Comment to use common sense and commercial practice in passing on these matters indicates that the adoption issue should be resolved on a case-by-case basis. In this case, the financing statement was accurate in every respect, except for the debtor's signature. The statement served its intended purpose—to give notice to subsequent creditors, such as the bank, that Zeco had granted a security interest to Barber-Greene. *See World Wide Tracers v. Metropolitan Protection*, 384 N.W.2d 442, 447 (Minn.1986) (the court, recognizing that a financing statement need only provide inquiry notice to prospective creditors, held that a collateral description that reasonably provides notice to creditors is adequate). The bank contends that an equally important purpose of the signature is to eliminate issues of authentication or fraud. But it is undisputed in this case that the debtor was aware of the financing statement, the debtor had read the statement, and by its word and deed had accepted the statement as authentic. From time to time, Zeco requested and received from Barber-Greene releases of its security interest. A written adoption in this case was unnecessary.

The bank argues that our decision in *Shelton v. Erwin*, 472 F.2d 1118 (8th Cir. 1973) compels a different outcome. In *Shelton*, the court held that a purported security interest was not enforceable because no security agreement existed. The court rejected the argument that the bill of sale and the title application, which indicated the creditor was the holder of the first lien, were sufficient to constitute a security agreement. *Id.* at 1120. The

---

2. The magistrate's instruction to the jury is similar to the language of Comment 39. The jury was instructed:

No catalog of possible ways that a financing statement can be legally authenticated can be compiled.

You must apply common sense to the evidence and determine whether or not the method of signing the Barber-Greene financing statement was adopted by Zeco with the intention to authenticate the financing statement.

bank argues that if documentary evidence was insufficient in *Shelton,* then "mere non-documentary course of dealing" by Zeco is insufficient to constitute an adoption. But *Shelton* is inapplicable here. That case involved the existence of a security agreement, which grants the security interest and creates the rights and obligations of the parties involved. Consequently, less stringent requirements for the validity of financing statements are justified. As the court in *Shelton* noted, the financing statement is merely evidence of the creation of a security interest, not the agreement itself. *Id.*

For these reasons, we hold that the magistrate's ruling that the adoption need not be in writing is neither lacking in reasoned analysis nor otherwise deficient.

### B. Proceeds

■ The bank contends that Barber-Greene is entitled to only those proceeds that are identifiable. *See* Minn.Stat.Ann. § 336.9–306(3). The bank argues that the proceeds became unidentifiable, however, once they were deposited in the collateral account. The bank's argument is premised on the magistrate's characterization of the deposits as "payment[s] to the Bank." [3] The bank maintains that these "payments" were made to the bank in the ordinary course of business and therefore, pursuant to Official Comment 2(c) to Minn.Stat.Ann. § 336.9–306, the payments cut off any rights that a secured creditor, such as Barber-Greene, had in the proceeds. We disagree.

Comment 2(c) provides:

Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The

law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.

The Comment presupposes an account over which the debtor exercises control, into which the debtor voluntarily makes deposits, and from which the debtor voluntarily makes payments to third parties who take in good faith. Zeco had no control over the collateral account. The bank had sole control. Zeco had no choice but to deposit the proceeds from the sale of all inventory into the collateral account. Zeco was never faced with decisions as to when and to whom payments from the account should be made, because Zeco had no control over the proceeds once they were deposited in the collateral account. Moreover, by applying the proceeds to Zeco's outstanding loan, the bank knowingly attempted to put itself in a better position than that of creditors like Barber-Greene who held superior claims to the proceeds. The principles set forth in Comment 2(c) were not intended to protect the bank in these circumstances.

■ The bank contends, alternatively, that at least the proceeds from the Ulland sale ($78,000) were paid out by Zeco in the ordinary course of its business. The bank maintains that all the deposits into the collateral account on May 5 or 6, including the $78,000, were subsequently redeposited into Zeco's general checking account and within two weeks paid out by Zeco in the ordinary course of its business. The bank argues that it received no benefit from the deposit of the proceeds in the collateral account because the balance after the proceeds had been paid out by Zeco was $1,000,000, the same as it was prior to the deposit of $78,000 Ulland check two weeks before. We disagree.

---

**3.** The magistrate concluded that the proceeds were identifiable. The magistrate found that "[t]his is not a case where the debtor commingled funds in his own bank account, but of payment of proceeds subject to a security interest, in original form, directly to a creditor with

an inferior claim thereto." "For all intents and purposes, a deposit into the Collateral Account was a payment to the Bank, and went directly into the Bank's coffers, regardless of how many accounts the bookkeeping department ran them through."

The bank's position ignores the transactions that occurred *during* the two week period. The proceeds in the collateral account were deposited by the bank in the loan account. The bank benefited as a creditor by receiving payments on the loan it made to Zeco. That the bank later made decisions to reloan Zeco funds is irrelevant. The proceeds deposited in the collateral account were applied by the bank to reduce the amount of money owed to it by Zeco, and thus the bank was placed in a better position than secured creditors with superior claims to those proceeds. The proceeds were not paid out by Zeco in the ordinary course of its business.[4]

Accordingly, we hold that the magistrate did not err in concluding that Barber-Greene is entitled to the proceeds in question.[5]

## III. CONCLUSION

We affirm the judgment in favor of Barber-Greene. The adoption of a signature on a financing statement pursuant to Minn. Stat.Ann. § 336.1-201(39) need not be in writing. The district court properly concluded that Barber-Greene is entitled to the proceeds in question.

---

**4.** The bank has submitted a copy of an arbitration award involving a similar dispute between Zeco, the bank, and another creditor. The arbitrator ruled in favor of the bank on the issue of the identifiability of the proceeds. The arbitrator *specifically refused to accept the magistrate's findings.* The arbitrator concluded that the creditor's security interest was defeated as a result of the creditor's "own failure to monitor its collateral and to impose the same commercially prudent obligations on Zeco as the Bank did." We have accepted the magistrate's findings, however, and believe the arbitrator's rather limited characterization of the circumstances in this case is unpersuasive.

**5.** The proceeds from a third sale, the Tower Asphalt sale, were also at issue. But the bank concedes that they are clearly identifiable and that the party with priority is entitled to recover those proceeds.