4 F.3d 1262
 21 UCC Rep.Serv.2d 193
 ORIX CREDIT ALLIANCE, INCORPORATED, formerly known as First
Interstate Credit Alliance, Incorporated, formerly
known as Credit Alliance Corporation,
Plaintiff-Appellant,
v.
SOVRAN BANK, N.A., Defendant-Appellee.
 No. 92-2386.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 29, 1993.
Decided Aug. 30, 1993.
 
 Joel Ira Sher, Shapiro & Olander, Baltimore, MD, argued (Timothy F. McCormack, Stewart P. Hoover, on brief), for plaintiff-appellant.
 Bruce H. Matson, Hazel & Thomas, P.C., Richmond, VA, argued for defendant-appellee.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, ERVIN, Chief Judge, and HAMILTON, Circuit Judge.
 HAMILTON, Circuit Judge:
 
 
 1
 Orix Credit Alliance, Inc. (Orix) appeals the district court's grant of summary judgment in favor of Sovran Bank (Sovran) awarding Sovran a priority claim to the proceeds arising from the sale of a Crane on which Orix maintained a security interest lien. Finding no error, we affirm.
 
 
 2
 * This controversy involves a dispute over the right to proceeds from the sale of a debtor's collateral. In September 1988, Orix and its debtor, A.E. Finley and Associates (Finley), entered into an agreement under which Orix agreed to finance, from time to time, Finley's acquisition of large industrial equipment and machinery which Finley would then either rent or resell. On September 30, 1988, Finley executed Orix's standard security agreement which granted Orix a security interest in all equipment financed by Orix.
 
 
 3
 On July 16, 1990, pursuant to their arrangement, Orix financed Finley's purchase of an American Crawler Crane (the Crane). Finley executed and delivered to Orix a promissory note in the amount of $305,000 and Orix filed a financing statement for the Crane with the appropriate Virginia officials. At the same time, Orix wrote a letter to Finley's lender, Sovran, which stated:
 
 
 4
 We (Orix) have acquired one or more security interests (sic) in the goods described below: [the Crane].
 
 
 5
 We would appreciate it greatly if you would acknowledge that our interest in the goods described above is, and will be, prior to any interest of your company in such goods. Please confirm by signing in the place provided below and returning the original of this letter to us.
 
 
 6
 Joint Appendix (J.A.) at 786. On July 16, 1990, a loan officer at Sovran, Elspeth McClelland, executed this subordination agreement, expressly acknowledging that Orix had a superior security interest in the Crane.
 
 
 7
 Finley maintained both a lending and depository relationship with Sovran. Specifically, Sovran provided Finley with a revolving line of credit and three bank accounts. The first account was a "cash collateral account," which was maintained by Sovran to receive all incoming payments from Finley's customers. Finley did not have direct access to or use of the funds in the cash collateral account. Each banking day, on a regular and routine basis, the deposits to the cash collateral account from the previous day were removed and applied to the outstanding balance of Finley's line of credit with Sovran. The second account was the "controlled disbursement account" on which Finley wrote checks. Under normal operating procedures, when the checks written on this account were presented to Sovran for payment, Sovran would notify Finley and, after Finley requested an advance under its line of credit, Sovran would then deposit sufficient funds from the line of credit into this account to pay the checks.[1] Sovran and Finley implemented this arrangement at the inception of their relationship in December 1988, and the established procedures remained unchanged.
 
 
 8
 In 1991, Finley's financial situation worsened. Thus, when Finley's line of credit formally expired in July 1991, Finley was unable to pay the outstanding balance due Sovran. Consequently, on September 4, 1991, Sovran formally declared default on Finley's line of credit. In an attempt to cure its financial situation, Finley decided to sell some of the equipment which it currently leased. Pursuant to this decision, Finley arranged to sell the Crane to Signet Leasing and Finance Corporation (Signet). Orix authorized this sale on the condition that Finley would first use the proceeds to pay the remaining debt owed to Orix on this Crane. Orix took no other precautionary measures to ensure payment by Finley even though, as the secured party, it was in a position to do so.
 
 
 9
 On September 20, 1991, Finley informed Sovran that Signet would be wiring $565,000 into Finley's cash collateral account and requested Sovran to notify Finley when the wire transfer arrived. After receiving the wire transfer on that day, Sovran provided Finley with the requisite notice and, on the next banking day, routinely transferred the funds to reduce Finley's line of credit balance.[2] On September 23, 1991--the first banking day after the wire transfer--Finley wrote a check on its controlled disbursement account to Orix for $257,648, the balance of the debt owed Orix on the Crane.
 
 
 10
 On September 30, 1991, this check was presented to Sovran for payment. On that day, Sovran advised Finley that a total of $288,388 had been presented for payment on the controlled disbursement account. As was customary, Finley then requested Sovran to advance that amount under the line of credit in order to cover these checks. In response, Sovran refused to advance the requested amount because it exceeded the remaining availability under Finley's line of credit.[3] Sovran further advised Finley that the applicable banking laws only required payment of approximately $6,000 in checks presented that day. Finley thus reduced its requested advance to $6,000. On the next day, October 1, 1991, Finley's check to Orix was again presented to Sovran for payment. Because the amount of the Orix check again exceeded Finley's availability under its line of credit, Sovran dishonored the check.
 
 
 11
 On October 2, 1991, Finley's loan officer at Sovran, McClelland, sent a memorandum to her superiors discussing the Finley line of credit. The memo indicated that, after the $2,000,000 line of credit expired in July 1991, Sovran's credit committee had approved an extension of this line of credit until October 31, 1991.[4] Despite this authorization, the memo indicated that McClelland had verbally informed Finley that Sovran would reduce the line to $1,600,000 through October 1, 1991, and, on that date, reduce the line an additional $200,000 to $1,400,000 until October 31, 1991.[5] The memo also suggested that, in order to avoid "arbitrarily cutting the line" and to protect the bank, Sovran should send written notice to Finley advising of these reductions. J.A. at 404. Finally, the memo indicated that, on October 1, 1991, Sovran "returned ... a large check to [Orix] that was being used to pay off some equipment that was sold." Id. The memo identified two reasons for returning this check:
 
 
 12
 (1) The line [of credit] balance would have been $1,595,000 and this would have been $195,000 over the agreed amount; and
 
 
 13
 (2) The collateral sheet showed that there was not the collateral availability. The availability was $1,574,000.
 
 
 14
 Id.[6] The same day, Sovran had Finley sign a letter formally acknowledging Sovran's reduction in the line of credit to $1,400,000, effective as of October 1, 1991. J.A. at 409-10.
 
 
 15
 After Sovran dishonored the check to Orix, Orix filed suit against Sovran in the United States District Court for the District of Maryland. After the completion of discovery, the parties filed cross motions for summary judgment. Orix essentially argued that, because the funds in Finley's cash collateral account on September 20, 1991 constituted identifiable proceeds from the sale of Orix's collateral, under Virginia's Uniform Commercial Code (Va.U.C.C.) Sec. 8.9-306(2) Orix had a continuing security interest in those funds. Thus, Orix claimed Sovran had no right to use the Signet-remitted funds to reduce Finley's line of credit balance with Sovran.
 
 
 16
 The district court rejected Orix's argument and granted Sovran's motion for summary judgment. The district court reasoned that the transfer of the funds in question occurred in Finley's ordinary course of business and, therefore, Va.U.C.C. Sec. 8.9-306 as qualified by Comment 2(c) to that section, extinguished Orix's security interest in those proceeds.
 
 
 17
 Orix now appeals to this court.
 
 II
 
 18
 In its appeal, Orix first contends that the use of funds from Finley's cash collateral account to reduce Finley's line of credit with Sovran cannot be considered a transaction in the ordinary course of Finley's business if Sovran knew another creditor had a security interest in those proceeds.[7] Orix reasons that Comment 2(c) to Va.U.C.C. Sec. 8.9-306 only protects a transferee who has no knowledge of a prior security interest in the proceeds received. We disagree.
 
 
 19
 Section 8.9-306(2) of the Va.U.C.C. gives a secured creditor a continuing security interest in "any identifiable proceeds [from the sale of collateral] including collections received by the debtor." However, this security interest in proceeds is not absolute. Comment 2(c) to this provision states, in relevant part:
 
 
 20
 Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course.
 
 
 21
 Although we found no Virginia authority directly on point, courts have uniformly recognized that a transferee's knowledge of a prior security interest in proceeds does not, by itself, suggest that the transfer of those proceeds occurred outside the ordinary course of the debtor's business. The case relied on by the district court, In re Halmar Distributor's, Inc., 116 B.R. 328 (Bankr.D.Mass.1990), rev'd on other grounds 968 F.2d 121 (1st Cir.1992), provides a good example.
 
 
 22
 In Halmar, a supplier sold inventory to a debtor on credit and took a purchase money security interest in that inventory and any resulting proceeds. The debtor also maintained a banking relationship similar to the arrangement Finley had with Sovran. Specifically, the debtor had a revolving line of credit and a lockbox account with its bank. Under the lockbox arrangement, the debtor's customers mailed all payments to that account and the bank automatically applied those receipts to reduce the debtor's line of credit. As a consequence of this arrangement, the bank often used proceeds from the supplier's collateral to reduce the line of credit even though the bank knew the supplier had a security interest in those proceeds.
 
 
 23
 When the debtor encountered financial difficulties and did not repay the supplier, the supplier filed suit against the bank. The supplier claimed that, because the supplier had a continuing security interest in the proceeds, the bank had no right to use those proceeds to reduce the outstanding balance on the debtor's line of credit with the bank. The bankruptcy court rejected this claim, reasoning in part that "the transfer of proceeds in the ordinary course of business ... [should have] the same consequences as ordinary course transfers of [the] original collateral." Id. at 333. Under Sec. 9-307(1) of the Uniform Commercial Code (U.C.C.), a purchaser of goods in the ordinary course of business takes those goods free of any security interest created by his seller, "even though the buyer knows of [the security interest]." Id. Thus, the bankruptcy court concluded that "a transfer [of proceeds] in the ordinary course of a debtor's business terminates a security interest [in those proceeds]" regardless of the transferee's knowledge. Id.
 
 
 24
 We believe Virginia law would apply the rationale of the Halmar court to the present case. As the First Circuit has noted:
 
 
 25
 [W]e can imagine good commercial reasons for not imposing, even upon sophisticated suppliers or secondary lenders, who are aware that inventory financers often take senior secured interests in "all inventory plus proceeds," the complicated burden of contacting these financers to secure permission to take payment from a [debtor's] ordinary commingled bank account.
 
 
 26
 Harley-Davidson Motor Co. v. Bank of New England, 897 F.2d 611, 622 (1st Cir.1990) (emphasis in original). Thus, we hold that a transferee's knowledge of a prior security interest in proceeds does not, by itself, indicate that the transfer of these proceeds occurred outside the ordinary course of the debtor's business. Consequently, Sovran's knowledge of Orix's prior security interest in the proceeds in question does not require a conclusion that Sovran's use of those proceeds to reduce Finley's line of credit occurred outside the ordinary course of Finley's business.
 
 III
 
 27
 Orix next contends that Sovran's use of the proceeds in question does not qualify as a transaction in the ordinary course of Finley's business because those proceeds were not "paid out in the operation of the debtor's business." Va.U.C.C. Sec. 8.9-306, Comment 2(c) (emphasis added). We disagree.
 
 
 28
 To support its argument, Orix relies on Barber-Greene Co. v. National Bank of Minneapolis, 816 F.2d 1267 (8th Cir.1987). In Barber-Greene, a supplier sold machinery on credit to a debtor, taking a security interest in that machinery. The debtor also maintained a banking relationship which included a revolving credit facility, a "collateral account" and a "general operating account." Pursuant to their agreement, the proceeds from the sale of the debtor's inventory were deposited in the collateral account. "The bank [then] periodically, and at its discretion, transferred funds from the collateral account" to reduce the debtor's loan balance. Id. at 1269 (emphasis added). Upon the debtor's request for credit, the bank would advance funds from the revolving loan and credit the debtor's general operating account.
 
 
 29
 When the debtor's financial situation deteriorated, the bank applied funds from all of the debtor's accounts to reduce the loan balance. Because the debtor did not pay the supplier, the supplier filed suit against the bank. The supplier claimed that it had a security interest in the proceeds superior to the bank's. In response, the bank argued that the transfers occurred in the ordinary course of the debtor's business and, therefore, Comment 2(c) to Va.U.C.C. Sec. 8.9-306 extinguished the supplier's security interest in those proceeds.
 
 
 30
 The Eighth Circuit rejected the bank's argument, concluding that "[t]he proceeds were not paid out by [the debtor] in the ordinary course of its business." Id. at 1273. The court reasoned:
 
 
 31
 Comment [2(c) ] presupposes an account over which the debtor voluntarily makes deposits, and from which the debtor voluntarily makes payments to third parties who take in good faith. [The debtor in the present case] had no control over the collateral account. The bank had sole control. [The debtor] had no choice but to deposit the proceeds from the sale of all inventory into the collateral account. [The debtor] was never faced with decisions as to when and to whom payments from the account should be made, because [the debtor] had no control over the proceeds once they were deposited in the collateral account.
 
 
 32
 Id. at 1272. In addition, the Barber-Greene court noted that Comment 2(c) to U.C.C. Sec. 9-306 was not intended to protect banks which knowingly attempt to place themselves in a stronger position than that of creditors holding a superior claim as to those proceeds. Id.
 
 
 33
 We think the rationale employed by the Barber-Greene court does not apply to the present case. In Halmar, a case which closely resembles the instant matter, the court concluded that the proceeds were "paid out" in the ordinary course of the debtor's business. In reaching this conclusion, the court distinguished Barber-Greene on the basis that:
 
 
 34
 [T]he cash transfers to the bank in [Barber-Greene ], far from being in the ordinary course, were precipitated by the debtor's deteriorating financial condition. The bank set off all of the debtor's deposit accounts, not just the collateral account, in payment of its indebtedness. It did so because of the debtor's defaults. Nor was there any of the consent and acquiescence which is present here.... The [Barber-Greene ] court was presented with conduct amounting to foreclosure, and the decision should be read in that light.
 
 
 35
 Halmar, 116 B.R. at 334.
 
 
 36
 We think this distinction applies with equal force to the present case. Unlike the bank's discretionary transfer of funds in Barber-Greene, Sovran routinely withdrew the previous day's deposits to Finley's cash collateral account on the next banking day and applied this amount against the outstanding balance due on Finley's line of credit with Sovran. Moreover, the system facilitating the transfer of these funds to Sovran remained unchanged from the inception of Sovran and Finley's relationship in 1988. In contrast, the bank in Barber-Greene began offsetting all of the debtor's accounts at the onset of its debtor's financial troubles. Because Sovran merely followed preexisting and long-established procedures, the concerns expressed by the Barber-Greene court relating to a bank's knowing attempt to gain a stronger position as to proceeds do not exist in the present case. Instead, under such circumstances we think the proceeds in question were "paid out in the operation of the debtor's business" as contemplated by Comment 2(c) to Va.U.C.C. Sec. 8.9-306.[8]
 
 IV
 
 37
 As a final argument, Orix contends that the district court erred in awarding summary judgment in favor of Sovran because the evidence before the district court created a genuine issue of material fact as to whether Sovran's use of the proceeds in question occurred in the ordinary course of Finley's business. Orix relies on two evidentiary facts to support this argument. We think neither evidentiary fact created a triable issue and discuss our reasons with respect to each fact separately.
 
 
 38
 * Orix first contends Finley's deteriorating financial condition and Sovran's subsequent declaration of default on Finley's line of credit on September 4, 1991, suggests that, at the time Sovran used the proceeds in question, there was no business as usual between Sovran and Finley. Thus, Orix concludes that the district court should conduct a full trial before determining whether the transaction in question occurred in the ordinary course of Finley's business. We disagree.
 
 
 39
 Comment 2(c) to Va.U.C.C. Sec. 8.9-306 states that, in order for a transferee of proceeds to take free of any security interest in those proceeds, the proceeds must be "paid out in the operation of the debtor's business." (Emphasis added). Thus, determining whether the transfer of proceeds occurred in the ordinary course of business requires us to focus on Finley's rather than Sovran's business. Despite Finley's financial troubles, we think the payments to Sovran clearly occurred within the ordinary course of Finley's business.
 
 
 40
 As previously discussed, Sovran and Finley, at the inception of their relationship in 1988, voluntarily established the procedures through which Sovran applied the proceeds in question. In addition, Sovran routinely and daily withdrew these funds automatically, without the exercise of any discretion by either party. Because this system existed before the onslaught of Finley's financial woes, and neither Finley's subsequent financial troubles nor Sovran's declaration of default altered this procedure, we think neither of these facts suggest that the transaction in question occurred outside the ordinary course of Finley's business. Thus, we believe the facts relied on by Orix did not create a triable issue.
 
 B
 
 41
 Orix also argues that Sovran's "retroactive" reduction of Finley's line of credit on October 2, 1991, from $1,600,000 to $1,400,000, and the subsequent dishonoring of Finley's check to Orix also suggest Sovran did not take the proceeds in the ordinary course of Finley's business.[9] Orix reasons that this "retroactive" reduction in Finley's line of credit reflects a deliberate attempt to avoid paying Orix. Orix adds "[i]f Sovran truly would have been operating in the ordinary course of business, it would have honored Finley's check to Orix based on the sufficient [collateral] availability that existed on the [two] days the check was presented for payment." Brief of Appellant at 21. Thus, Orix concludes that a trial is necessary to determine whether the transaction in question occurred in the ordinary course of Finley's business. We disagree.
 
 
 42
 The "ordinary course" transfers described in Comment 2(c) to Va.U.C.C. Sec. 8.9-306 "ha[ve] a fairly broad meaning" and exclude only that conduct which "in the commercial context, is rather clearly improper." Harley-Davidson, 897 F.2d at 622. In the present case, the uncontradicted evidence in the record indicates that Sovran and Finley verbally agreed to the reductions in the line of credit on September 11, 1991. J.A. at 439. Because the parties agreed to these reductions before Sovran knew of Finley's check to Orix--Finley did not even write this check until September 20, 1991--we think the evidence in the record does not support a conclusion that Sovran deliberately implemented a "retroactive" reduction in Finley's line of credit merely to avoid paying Orix. Thus, Sovran's reduction in the line of credit was not "clearly improper" and did not occur outside the ordinary course of Finley's business.[10]
 
 V
 
 43
 For the reasons stated herein, the judgment of the district court is affirmed.
 
 
 44
 AFFIRMED.
 
 ERVIN, Chief Judge, dissenting:
 
 45
 The majority recognizes the sole issue on appeal to be whether the transfer of the proceeds in question occurred in Finley's ordinary course of business, so as to extinguish Orix's security interest in those proceeds pursuant to Comment 2(c)[1] to the Uniform Commercial Code of Virginia,[2] Sec. 8.9-306 (Michie 1991). Because I believe that we need not reach Comment 2(c) to resolve this case, I respectfully dissent.
 
 
 46
 Applying the proper standard in the context of summary judgment motions, the district court found that the facts, viewed in the light most favorable to Orix, revealed the following:
 
 
 47
 (1) Orix had a purchase money security interest in the Crane that was properly filed; (2) whatever interest Sovran had in the Crane was subordinated to Orix's security interest; (3) the appropriate portion of the Signet wire transfer represented proceeds of the sale of the Crane; (4) Orix's security interest in these proceeds was superior to Sovran's[;] and (5) Sovran knew the wire transfer included proceeds in which Orix had a superior security interest.
 
 
 48
 See Orix Credit Alliance, Inc. v. Sovran Bank, No. MJG-91-2936, slip op. at 5, 1992 WL 541256 (D.Md. Oct. 16, 1992). Despite these conclusions of law and fact, the district court determined--and the majority agrees--that Comment 2(c) to section 8.9-306 provides an exception to the traditional priority scheme outlined in Article 9. This exception, the majority holds, entitles Sovran to a superior claim to the Crane proceeds.
 
 
 49
 In accepting the inferences drawn by the district court and limiting its analysis to Comment 2(c), the majority overlooks the district court's impermissible resolution of disputed material facts and erroneous application of Article 9. Rather than reach out to embrace the official commentary to section 8.9-306 as an exception to the major premises of the Code itself, imbuing the commentary with the authority of law without supporting precedent from the State of Virginia or this circuit, I would resolve this appeal by addressing the following three issues prematurely conceded in Orix's favor by the district court: (1) whether any interest Sovran might have in the Crane was subordinated to Orix's security interest in the Crane; (2) whether Orix had a properly perfected purchase money security interest in the Crane; and (3) whether Orix's security interest in the Crane and its proceeds was superior to Sovran's.
 
 
 50
 * I address the enforceability of the subordination agreement between Orix and Sovran first because, if it serves effectively to bind the parties in a contractual system of priorities outside the scope of Article 9, the need for further analysis ceases and the rights to the Crane proceeds emanate solely from within the four corners of the subordination agreement.
 
 
 51
 The Uniform Commercial Code generally, and Article 9 specifically, allow parties to modify by contract their duties and rights as outlined in the Code. See, e.g., Va.Code Ann. Sec. 8.1-102(3) (Michie 1991) ("The effect of provisions of this act may be varied by agreement...."); id. Sec. 8.9-316 ("Nothing in this title prevents subordination by agreement by any person entitled to priority.") The Code has defined "agreement" as
 
 
 52
 the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in Secs. 8.1-205 and 8.2-208. Whether an agreement has legal consequences is determined by the provisions of this act, if applicable; otherwise by the law of contracts....
 
 
 53
 Id. Sec. 8.1-201(3) (Michie Supp.1993). These provisions of the Code suggest that a subordination agreement may serve to alter the priority relationship between Orix and Sovran under Article 9; the agreement, however, only supplants Article 9 to the extent that Virginia's rules governing contract interpretation permit the necessary construction.
 
 
 54
 The subordination agreement in this case states:
 
 
 55
 We have acquired one or more security interest [sic] in the goods described below:
 
 
 56
 One (1) American Model 5300 Crawler Crane S/N 9007AC3516 W/third drum, 9 ton jibWe would appreciate it greatly if you would acknowledge that our interest in the goods described above is, and will be, prior to any interest of your company in such goods. Please confirm by signing in the place provided below and returning the original of this letter to us.
 
 
 57
 The agreement, dated July 16, 1990, was signed by Elspeth McClelland, First Vice President of Sovran and the account officer handling the Finley-Sovran relationship. For the purposes of this case, the crucial issue is whether the subordination agreement alters Orix's and Sovran's priority as to the Crane and its proceeds or as to the Crane alone. If, on the one hand, the agreement encompasses the Crane and its proceeds, Orix has a claim to the proceeds at issue superior to Sovran's.[3] On the other hand, if the subordination agreement covers only the Crane, then it alters Orix's and Sovran's relative priorities only as to the Crane. Article 9 then would establish their priority as to the proceeds.[4]
 
 
 58
 The subordination agreement itself is silent as to proceeds, and this silence suggests more than one possible interpretation.[5] When faced with a contract interpretation problem, Virginia courts have outlined three possible courses of action. In the first instance, in which the contract is clear and unambiguous on its face, the court assumes the duty to construe its meaning. Greater Richmond Civic Recreation, Inc. v. A.H. Ewing's Sons, Inc., 200 Va. 593, 596, 106 S.E.2d 595, 597 (1959). In the second situation, in which extraneous testimony that is properly admitted makes a contract clear and unambiguous, the court again assumes the duty to construe its meaning. Main-Atlantic Corp. v. Francis I. duPont & Co., 213 Va. 180, 184, 191 S.E.2d 211, 215 (1972); see also Burns v. Eby & Walker, Inc., 226 Va. 218, 221-22, 308 S.E.2d 114, 116 (1983) ("If the contract is not clear and unambiguous on its face but extraneous evidences makes it so, the court also has the duty to construe it."). Under the final scenario, in which the contract is ambiguous and resort to parol evidence becomes necessary, "the meaning of the contract upon the evidence should be submitted to the jury if reasonable [persons] might draw different conclusions therefrom." Greater Richmond, 200 Va. at 596, 106 S.E.2d at 597. "[T]hen the construction of the contract is for the jury under proper instructions from the court, even though the evidence be not conflicting." Geoghegan Sons & Co. v. Arbuckle Bros., 139 Va. 92, 100-01, 123 S.E. 387, 389 (1924).
 
 
 59
 This case falls into the third category. The summary judgment record contains nothing that would make the subordination agreement clear and unambiguous on the point of proceeds.[6] Therefore, I believe that the construction of the subordination agreement as to proceeds is an issue properly relegated to the factfinder.
 
 
 60
 The district court's hasty application of Comment 2(c) on Sovran's motion for summary judgment in lieu of interpreting the subordination agreement undercuts one of the principal policies of the Uniform Commercial Code--"to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Va.Code Ann. Sec. 8.1-102(2)(b) (Michie 1991). In addition, as outlined previously, the outcome of this case lies in the interpretation of the subordination agreement and not in the rote application of Comment 2(c) without further regard to the specific circumstances at hand.
 
 
 61
 For the foregoing reasons, I would reverse the district court's decision to grant Sovran's motion for summary judgment and remand the case for factfinding as to and proper construction of the subordination agreement. While ordinarily I would go only this far, because I dissent, I feel obliged to explain why the "ordinary course" exception of Comment 2(c) would not apply at all to the circumstances arising in this case.
 
 II
 
 62
 If the factfinder were to conclude that the subordination agreement applies only to the Crane itself, Orix's and Sovran's priority positions as determined under Article 9 as to the Crane proceeds would remain unaltered. Section 8.9-312 of the Uniform Commercial Code then would supply the means by which their relative priorities would be determined. Section 8.9-312(5)[7] establishes the general rule that the first to file or perfect a security interest maintains the superior claim among conflicting security interests. Va.Code Ann. Sec. 8.9-312(5) (Michie 1991). The remaining subsections of section 8.9-312 outline exceptions to that general rule, one of which governs the purchase money security interest ("PMSI") in inventory. Id. Sec. 8.9-312(3).
 
 The Code provides:
 
 63
 (3) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if
 
 
 64
 (a) the purchase money security [interest][8] is perfected at the time the debtor receives possession of the inventory; and
 
 
 65
 (b) the purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, or (ii) before the beginning of the twenty-one-day period where the purchase money security interest is temporarily perfected without filing or possession as provided in subsection (5) of Sec. 8.9-304; and
 
 
 66
 (c) the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and
 
 
 67
 (d) the notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.
 
 
 68
 Id.
 
 
 69
 Orix has failed to establish a PMSI in the Crane on two grounds. First, Orix's alleged PMSI was not perfected at the time Finley received possession of the Crane. Finley entered into a lease agreement with Tidewater Construction Corporation ("Tidewater") under which Finley agreed to purchase one American Model 5300 Crawler Crane and deliver it to Tidewater under a twelve-month lease. Orix agreed to finance Finley's purchase of the Crane. The uncontroverted deposition testimony of William R. Godwin, secretary-treasurer and chief financial officer of Finley, indicates that the Crane was delivered to Tidewater on July 19, 1990. The summary judgment record also reflects that Orix filed financing statements signifying its security interest in the Crane at the appropriate state and county offices on July 20, 1990 and July 23, 1990 respectively.
 
 
 70
 Orix's security interest in the Crane became perfected when the interest had attached and all of the applicable steps required for perfection had been taken. Va.Code Ann. Sec. 8.9-303(1) (Michie 1991). One of the steps required for perfection is the filing of appropriate financing statements. See id. Sec. 8.9-302. Orix's filings were not complete until July 23, 1990, after Tidewater received the Crane.[9] By postdating possession of the collateral, the filings fail to satisfy section 8.9-312(3)(a)'s requirement that the PMSI be perfected at the time the debtor receives possession of the inventory.
 
 
 71
 Orix cannot invoke the priorities of section 8.9-312(3) for a second reason. Orix could not have received the proceeds in question on or before the delivery of the inventory to the buyer. Tidewater, the lessee of the Crane, agreed with Finley to purchase the Crane at the termination of its twelve-month lease. The transaction was structured as a sale to Signet Leasing and Finance Corporation and a leaseback to Tidewater, but the Crane never left Tidewater's possession. Orix suggests that, because Signet actually bought the Crane and itself never had possession of it, the requirement that the proceeds precede possession of the Crane is satisfied. This contention artificially limits possession to one who physically has the Crane. Possession may be actual or constructive;[10] in this case, although Tidewater had actual possession of the Crane, Signet had constructive possession of it upon entering into the sale-leaseback agreement with Finley effectively on August 30, 1991, twenty-one days before Finley received the wire-transfer containing the Crane proceeds. Therefore, even if Finley had directed the proceeds to Orix the day it received them from Signet, the transfer would be too late to qualify under section 8.9-312(3)'s exception.
 
 
 72
 Absent benefit of the superior position accorded by section 8.9-312(3), Orix must enter into a first-in-time, first-in-right battle with Sovran over the proceeds under the general rule of section 8.9-312(5). Orix loses this contest because Sovran's security interest dates back to December 29, 1989, when it entered into a revolving loan arrangement with Finley secured by present and after-acquired inventory and its proceeds.
 
 III
 
 73
 Unlike the majority, I believe this case can and should be resolved without reaching the "ordinary course" exception of Comment 2(c). When we could reach a logical and reasoned outcome by applying the provisions of a state's version of the Uniform Commercial Code, we ought to do so rather than needlessly inflate the official commentary to the dignity of law. Although my analysis might lead ultimately to the result reached by the majority, I must respectfully dissent in favor of allowing the factfinder to construe the subordination agreement. For this reason, I would reverse the district court's decision.
 
 
 
 [1]
 The third account was a payroll account which is not relevant to this appeal
 
 
 [2]
 This wire transfer included proceeds arising from Signet's purchase of the Crane and other equipment from Finley
 
 
 [3]
 Had Sovran advanced the funds requested on September 30, 1991, Finley's indebtedness to Sovran would have totalled $1,602,206 or $2,206 in excess of the $1,600,000 total credit available. J.A. at 279
 
 
 [4]
 At her deposition, McClelland testified that there was only an internal authorization by Sovran's credit committee to extend the line until October 31, 1991. Sovran did not communicate this extension to Finley. J.A. at 329
 
 
 [5]
 Finley and Sovran apparently reached an oral agreement on these reductions at a meeting held on September 11, 1991. J.A. at 439
 
 
 [6]
 Notably, on October 1, 1991 the Orix check only exceeded the available line of credit because Sovran reduced the amount of credit from $1,600,000 to $1,400,000 on that day. Under the $1,600,000 line of credit in effect until September 30, 1991, the Orix check would not have exceeded the available credit
 
 
 [7]
 The parties dispute whether Sovran actually knew that the September 20, 1991, wire transfer contained proceeds from the sale of collateral in which Orix had a security interest. For purposes of reviewing the district court's summary judgment, however, we must view the facts in the light most favorable to Orix. Thus, we will assume Sovran had such knowledge
 
 
 [8]
 We think these facts also distinguish the instant matter from other cases relied on by Orix. See, e.g., National Acceptance Co. of America v. Virginia Capital Bank, 498 F.Supp. 1078, 1083 (E.D.Va.1980); In re Northwest Liquor Industries, Inc., 107 B.R. 616 (Bankr.W.D.Wi.1988); Dominion Bank of Richmond v. Plaza One Associates, 15 U.C.C. Reporting Service 2d 1349, 1991 WL 296735 (E.D.Va.1991); Linn Cooperative Oil Co. v. Norwest Bank Marion, 444 N.W.2d 497 (Iowa 1989); Citizens National Bank of Whitley County v. Midstates Development Company, Inc., 177 Ind.App. 548, 380 N.E.2d 1243 (1978). In all of these cases, the courts determined that the respective suppliers had a superior interest in proceeds which the banks had used to reduce the debtors' debt with the bank. However, none of these cases involved an arrangement whereby, from the inception of the bank's relationship with its debtor, the bank automatically withdrew funds from the debtor's account
 In fact, the disputed transactions in most of these cases involved a bank's right to set-off. Such transactions rarely occur within the ordinary course of business. See, e.g., Franklin v. First National Bank of Morrill, 848 P.2d 775, 781 (Wy.1993) ("This definition [of ordinary course of business] expressly excludes set-offs of preexisting debt."); Tuloka Affiliates v. SEC State Bank, 229 Kan. 544, 627 P.2d 816, 820 (1981) (The seizure of funds through the right of set-off presents a unique situation....").
 
 
 [9]
 Orix argues that Sovran "retroactively" reduced Finley's line of credit because Sovran did not write its memorandum discussing the proposed reduction or solicit Finley's written acknowledgment of this reduction until the next day, October 2, 1991
 
 
 [10]
 Moreover, because Finley's requested advances on September 30 and October 1, 1991 exceeded the remaining available credit under Finley's line of credit with Sovran, we do not think the mere existence of sufficient "collateral availability" on these two days indicates that Sovran wrongfully dishonored the check to Orix
 
 
 [1]
 Comment 2(c) provides:
 Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would no doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party.
 Va.Code Ann. Sec. 8.9-306 official comment 2(c).
 
 
 [2]
 The law governing this diversity action is that of the State of Virginia. Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Virginia has adopted the Uniform Commercial Code. See Va.Code Ann. Secs. 8.1-101 to 8.9-507 (Michie 1991 & Supp.1993). Hereinafter, references to the Uniform Commercial Code ("the Code") will be to the version found in the Code of Virginia. "Article 9" refers to those provisions of the Code which deal with secured transactions
 
 
 [3]
 The majority would contend that such a construction of the subordination agreement is irrelevant; the "ordinary course" exception of Comment 2(c) would operate in any event to restore Sovran's priority position. I disagree with this construction of Comment 2(c). Although the comment suggests a means by which persons may alter the priority scheme generally established by Article 9, it should not provide one party an opportunity by which to renege on its contractual obligations to another party
 Comment 2(c) contemplates protection for one who receives, in the ordinary course of business, payment in the form of proceeds collected by the debtor on the disposition of inventory collateral. The comment does not define "ordinary course" or give an example of its application. Only by reviewing analogous provisions of the Code is the meaning of Comment 2(c) informed.
 Section 8.9-307(1) of Virginia's Uniform Commercial Code provides that a buyer in ordinary course of business (subsection (9) of Sec. 8.1201) takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.
 Va.Code Ann. Sec. 8.9-307(1) (Michie 1991). Section 8.1-201(9) defines "buyer in ordinary course of business" as:
 a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind....
 Id. Sec. 8.1-201(9) (Michie Supp.1993).
 Reading sections 8.9-307(1) and 8.1-201(9) together results in a buyer taking free of an existing security interest only if he merely knows that there is a security interest that covers the goods. If the buyer knows that a security interest covers the goods and, in addition, that the sale is in violation of some term in the security agreement not waived by the word or conduct of the secured party, she takes the goods subject to the security interest. See id. Sec. 8.9-307 official comment 2.
 For example, suppose that a bank officer finances an automobile dealer's floor plan and takes a security interest in all cars in inventory. The officer then goes to that dealership and buys a car. She knows that the bank for which she works has a security interest in the cars; however, she buys her car free of the bank's security interest in the ordinary course of business. Suppose the car dealership suffers a financial setback and loses its dealer franchise; the bank places the floor plan loan in default and orders the dealer, pursuant to their security agreement, to cancel any additional factory deliveries, hold all the cars currently on the lot, and look for another dealership to buy the excess inventory in bulk. Now if the bank officer, knowing the situation and status of the loan, goes to the dealer and attempts to get a good deal on one of the cars before it is moved out to another dealership, the officer loses the protection of being a buyer in the ordinary course of business and would take the car subject to the bank's security interest. The officer's purchase would involve knowingly gaining an advantage over the secured party. The Code's preference for bona fide purchasers does not extend this far.
 In this case, Sovran claims to be a recipient of proceeds, rather than the purchaser of goods, in the ordinary course of business. The principles embodied in sections 8.9-307(1) and 8.1-201(9) should apply nonetheless. Sovran entered into an agreement with Orix to relinquish any priority claim it might have in the Crane to Orix. The agreement moved Orix and Sovran outside the priorities established pursuant to their respective security agreements with Finley and etched contractually a scheme of priority whereby Orix would prevail as to any interest in the Crane. For Sovran subsequently to appropriate proceeds from Finley's sale of the Crane represents a taking of the proceeds with the knowledge that Orix's security interest exists and that the taking of the proceeds subject to the security interest would be in direct violation of the subordination agreement. This type of appropriation should not be protected in the ordinary course of business. Cf. J.I. Case Credit Corp. v. First Nat'l Bank, 991 F.2d 1272, 1279 (7th Cir.1993) ("[U]nder Comment 2(c), a payment is within the ordinary course if it was made in the operation of the debtor's business and if the payee did not know and was not reckless about whether the payment violated a third party's security interest."). Therefore, if the subordination agreement were found to cover both the Crane and its proceeds, Sovran has unconditionally relinquished priority to the proceeds in question and Orix is entitled to them.
 
 
 [4]
 The outcome under this scenario is discussed infra pages 1272 to 1274
 
 
 [5]
 For example, under other provisions of the Code, neither a security agreement nor a financing statement needs to mention proceeds for its application to extend to proceeds. See Va.Code Ann. Secs. 8.9-110, 8.9-203(3), 8.9-402(1) (Michie 1991)
 
 
 [6]
 Elspeth McClelland testified at her deposition as to her interpretation of the subordination agreement, but this testimony alone does not remove unequivocally the existing ambiguities in the agreement's meaning:
 Q. And this particular one, what did you think you were agreeing to when you signed this?
 A. Basically what it says their interest in the goods described above is, and will be prior to any interest of your company, meaning Sovran Bank.
 
 
 [7]
 Section 8.9-312(5) provides:
 In all cases not governed by other rules stated in this section, including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section, priority between conflicting security interests in the same collateral shall be determined according to the following rules:
 (a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.
 (b) So long as conflicting security interests are unperfected, the first to attach has priority.
 Va.Code Ann. Sec. 8.9-312(5) (Michie 1991).
 
 
 [8]
 The National Conference of Commissioners on Uniform State Laws and the American Law Institute, when drafting the text of the Uniform Commercial Code, included the word "interest" in section 8.9-312(3)(a). I assume its omission by the Virginia General Assembly was mere oversight and not meant to change the substantive meaning of the subsection. Hereinafter, I refer to the subsection with the insertion of the omitted language
 
 
 [9]
 That Tidewater, Finley's lessee, received possession of the Crane, and not Finley, has no impact on the application of section 8.9-312(3)(a). The Code recognizes that the debtor will not in all instances actually receive the goods subject to the security interest. See, e.g., Va.Code Ann. Sec. 8.9-112 (Michie 1991) ("[W]hen a secured party knows that collateral is owed by a person who is not the debtor, the owner of the collateral is entitled to [various rights]...."); id. Sec. 8.9-203(1)(c) ("[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless ... the debtor has rights in the collateral.")
 
 
 [10]
 Constructive possession occurs in situations in which one does not have physical custody or possession, but is in a position to exercise dominion or control over the property. Black's Law Dictionary 314 (6th ed. 1990)